<div align="right">IN ERROR.<br>•••••••<br>ALBANY,<br>January, 1819.<br>NOVION<br>v.<br>HALLETT.</div>

—◦✕◦—

<div align="center">JOHN B. NOVION, plaintiff in error,<br><i>against</i><br>ABRAHAM S. HALLETT, defendant in error.</div>

A WRIT of error was brought, by the defendant in the
Court below, upon the bill of exceptions, which was taken
at the trial, and on which, after argument, the Supreme
Court rendered judgment for the plaintiff below. (See
*Hallett* v. *Novion,* 14 *Johns. Rep.* 273—294.) The cause

<div align="right">No action at<br>common law<br>lies for an ille-<br>gal capture on<br>the high seas,<br>as prize of war;<br>and no irregu-<br>larity or mis-<br>conduct of the<br>captor, in the<br>subsequent dis-</div>

position of the prize, can confer jurisdiction as to the original taking, or is, in itself, a ground of
action at common law.

Jurisdiction, in cases of prize, and of every thing incidental, and consequential thereto, be-
longs exclusively to the admiralty.

And piracy, and piratical captures, with all their incidents, are exclusively of admiralty cog-
nizance.

It makes no difference that the capturing vessel was fitted out in a port of the United States, in
violation of our neutrality, or an act of Congress; and in such case the district courts of the Uni-
ted States have a clear and indisputable jurisdiction.

IN ERROR.    having undergone a full and most elaborate discussion in
········        the Supreme Court, was here briefly argued, by *Burr*, for
ALBANY,       the plaintiff in error, and *Henry*, for the defendant'in error.
January, 1819.

NOVION         *Burr*, to show that the subsequent disposition of the cap-
v.            tured property did not affect the question, cited *Faith* v.
HALLETT.       *Pearson*, (6 *Taunt*. 439.*a*.) where it was held, that no action
              lies against the commander of a *British* ship of war, for
              seizing and detaining a vessel on suspicion of her being hos-
              tile prize ; though he, afterwards, dismisses her without
              libelling her in the Court of Admiralty ; and though he de-
              tains her partly on suspicion of matters which are causes
              only of forfeiture, if she is *British*. He insisted, also, on the
              decree of the District Court in *North Carolina*, (see 14 *Johns*.
              *Rep*. 278.) as an objection, at least in part, to the recovery.

              *Henry* cited *Livingston* v. *Bishop*, ( 1 *Johns*. *Rep*. 290.)
              as an authority that a recovery without satisfaction is no bar
              to another suit.

              THE CHANCELLOR.    The writ of error in this case is
              founded upon a bill of exceptions taken to the charge of the
              judge who presided at the trial, and the direction in point of
              law, given to the jury, embraces the legal principles upon
              which the discussion of the case has turned.
                 The jury were charged, that if, from the evidence, they
              believed that the schooner *San Francisco de Paula* had on
              board a commission as a letter of marque, under the govern-
              ment, *de facto*, of *New Grenada* or *Carthagena*, and claimed
              to act under it in capturing, and also in the subsequent dis-
              position of the brig *Jane*, the plaintiff was not entitled to
              recover, because the question of prize or no prize, involv-
              ing the validity of that commission, belonged exclusively to
              admiralty jurisdiction.
                 The correctness of this part of the charge is not drawn in
              question, and I should say, it would have been more pre-
              cisely correct if the words, " and also in the subsequent
              disposition of the brig," had been omitted.   If the original

              *a* S. C. at N. P. *Holt's N. P. Rep*. 113.   4 *Campb*. 357.

taking as prize, renders the matter exclusively of admiralty jurisdiction, the subsequent disposition of the prize cannot alter the case, for it is but a circumstance or incident which necessarily follows the jurisdiction of the principal question. This brings me to the consideration of the second part of the charge, and which involves the whole merit or substance of the question before this Court.

The learned judge further charged the jury, that if it were proved that the schooner had such a commission on board, and acted under it in capturing the brig; but that instead of treating her as prize of war, by conducting or endeavouring to carry her to a port of the captors or their allies, for the purpose of adjudication before a competent tribunal, the brig, in fact, was carried by the captors into the *United States* in the disguise of a private merchant vessel, and claimed and disposed of there by the defendant as his private property, then the defendant was, in judgment of law, to be considered a trespasser *ab initio*, and the plaintiff was entitled to recover the value of the cargo.

I presume the verdict of the jury was founded upon this part of the charge. It was clearly proved upon the trial, that the captured brig and her cargo were covered by a *Spanish* name, and disguised by *Spanish* papers and colours, and a *Spanish* crew. I think it was equally proved, that the schooner, though fitted out in the *United States*, and sailing from thence a few days previous to the capture, under a clearance for *Carthagena*, had, in fact, on board a commission of the date of *November*, 1812, from the government of the States of *Carthagena de Indias*, duly executed, and authorizing the schooner to cruise under the flag of that state against *Spanish* vessels and property. It was equally in proof, that the brig was captured by the schooner on the high seas under the *Carthagena* colours, and that she was taken possession of as prize, and the crew taken out, and a prize master and prize crew put on board. It was further in proof, that after the capture, the brig was sent to the *United States*, and shortly after arrived at *Beaufort* in *South Carolina*, in disguise under *Spanish* colours, and in the character of a *Spanish* merchant vessel, and was disposed of without being libelled or condemned as prize. But it ap-

IN ERROR,
........

ALBANY,
January, 1819.

NOVION
v.
HALLETT.

IN ERROR.
........
ALBANY,
January, 1819.

NOVION
v.
HALLETT.

peared, that the capturing privateer, after the capture, pur-
sued her course towards *Carthagena*, and took a *Spanish*
ship as prize, in her way, and that she entered the harbour
of *Carthagena* under *Carthagena* colours, and fired a
salute, and that the *Spanish* ship also arrived, and was con-
demned and sold, and the crew of the capturing schooner
received their share of the prize money.

That the conduct of the privateer, subsequent to the cap-
ture, in relation to her prize, was irregular and fraudulent,
cannot be doubted. She was directed by her very commis-
sion to bring her prizes within the state of *Carthagena*, and
not to dispose of them until the lawfulness of the prize had
been declared. The commander of the privateer was no
doubt soon satisfied, that the brig, though under the disguise
of a *Spanish* vessel, was not really *Spanish* property, and
fearing the test of a judicial inquiry, he took the mean and
piratical course of disguising the prize, and appropriating
her under fraudulent pretences.

That the owner of the privateer is justly responsible to
the plaintiff for all the damages recovered, will also not be
denied. The only question is, whether the common law
courts of this state have jurisdiction of the case. It is ad-
mitted, that they have no jurisdiction of the original taking ;
but it is asserted, that the subsequent disposition of the
subject, if it be not treated as a prize of war, may render
the captor a trespasser *ab initio*, and liable to an action of
trespass at common law.

I apprehend that there is no such distinction existing, and
that if the property be taken in the first instance as prize of
war, the subsequent conduct of the captors, whatever it may
be, cannot alter the right of jurisdiction.

The mere fact, in this case, that the brig was captured, or
taken possession of as prize of war, under an assumed right
to do so, (and whether well or ill founded, is immaterial as
to the point in question,) appears most manifestly from the
case. The schooner had a commission from a state as-
suming powers of government, and was commissioned to
take *Spanish* vessels. The brig captured appeared in a
*Spanish* character. Captain *Rose* admits, that when taken,
the privateer put *a prize master and five men on board*, and

another witness, (*John Harris*,) says, that the brig was taken as prize, and a prize master and prize crew put on board, and he and two other witnesses, (*Robert Silver* and *John Bastard*,) unite in saying, that the privateer had *Carthagena* colours hoisted at the time of the capture. The fact, then, is not to be questioned, that the brig was, in the first instance, captured as prize of war.

IN ERROR.
........
ALBANY,
January, 1819.

NOVION
v.
HALLET.

This being the case, it belongs exclusively to the Admiralty Courts of the *United States* to judge of the validity of the capture, of the competency of the commission, of the effect of the original act of arming within the *United States*, and of every possible question arising out of the capture.

Though the law on this subject is deemed to be clearly settled, yet a just respect for the authority of the decision now under review, renders it proper to look into the cases.

The governing case on this subject, and which has since commanded uniform and universal assent, is that of *Le Caux* v *Eden*, (*Doug.* 594.) decided in *England* during the period of the *American* war. That case is particularly distinguished for the firm and decided opinion which Lord *Mansfield* expressed on the subject, and for the elaborate and learned review of all the cases which was given by Mr. J. *Buller*, and which he traced down from the time of *Elizabeth*.

The decision in that case was, that an action at common law, for false imprisonment, would not lie, where the imprisonment was merely in consequence of taking a ship as prize, though the ship should afterwards be acquitted in the admiralty, as not being lawful prize.

The counsel for the plaintiff relied on the fact, that though the ship had been taken as prize, yet the admiralty decision showed that she was not lawful prize, and that the admiralty did not assess damages for personal injuries. But it was answered on the other side, that not only the original question, prize or no prize, but all the necessary consequences of the capture, belonged solely to the jurisdiction of the admiralty; and that to separate the question of prize or no prize, and that concerning the incidental damages, would be to divide between two different jurisdictions one and the same entire transaction.

IN ERROR.
........
ALBANY,
January, 1819.

NOVION
v.
HALLETT.

The judges of the K. B. gave their opinions separately, and in the opinions of *Willes* and *Ashhurst*, Justices, it was held, that where the injury was a necessary consequence of the capture, the Court of Admiralty had the exclusive jurisdiction; that the admiralty could assess damages for personal torts,(a) and that where the admiralty had jurisdiction of the original matter, it had jurisdiction of every thing necessarily incidental. But Mr. J. *Buller* went more at large into the subject, and Lord *Mansfield* gave his assent to all he said.

He found, upon examination, that there was no case or *dictum* that an action at common law would lie where the original taking was as prize, and that there was a current of authorities from the reign of *Elizabeth*, that the admiralty had the sole exclusive jurisdiction, not only of the question, prize or no prize, but of all its consequences. He cited the case of *Rous* v. *Hassard*, in which Ch. J. *Lee*, in 1750, delivered the opinion of a Court of Appeals, and said that though for taking a ship on the high seas, trespass would lie at common law ; yet when it was taken as prize, though taken wrongfully, though it were acquitted, and though there were no colour for the taking, the Judge of the Admiralty was judge of the damages and costs as well as of the principal matter, and such an action would not lie at common law. He said that it was resolved, in 43 *Eliz.* that if goods be taken by pirates at sea, and sold afterwards on land, yet that the admiralty had cognizance of the suit for the property, for that which was incident to the original matter, shall not take away the jurisdiction. He next mentioned the case of *Ridly* v. *Eglesfield*, (1 *Vent.* 173.  2 *Lev.* 25.  2 *Saund.* 259 ) in which it was held by the K. B. in the time of *Charles* II. and at the head of which court was Sir M. *Hale*, that in a suit to try the property of goods taken at sea by a privateer, and condemned in the *Scotch* Admiralty and sold, the question was still of admiralty jurisdiction, for that neither the sentence nor the sale altered the jurisdiction, for the

(a) In the case of the *Amiable Nancy*, 3 *Wheaton*, 546. it was admitted, that the prize court might give damages, and exemplary damages for a marine trespass.

original taking must " come in question again." He re-
ferred also to the case of *Turner* and *Carey* v. *Nell*, (1 *Lev.*
243. 1 *Sid.* 367. 2. *Keb.* 360. 364.) where a Letter of
marque had taken an *Ostend* for a *Dutch* ship, and brought
her into *England* and libelled her. She was held not to be
a prize; and it was also held, in the K. B. that the proper
Court for the *Ostender* to sue for his damages done to his
ship, even after she had been brought into the *English* port,
was in the admiralty, because the bringing into port was but
a consequence of the capture; *and not only the original, but
the consequences, must be tried in the admiralty.* This case
in *Levinz* was referred to by Mr. J. *Ashhurst,* as placing the
question of jurisdiction on the true and solid ground. Mr.
J. *Buller* referred to the reason given by Ch. J. *Lee,* in *Key
& Hubbard* v. *Pearse,* why the jurisdiction of prize or no
prize was appropriated to the admiralty. It was because
prizes were acquisitions *jure belli,* and the *jus belli* was to be
determined by the law of nations, and not by the particular
municipal law of any country. The jurisdiction did not
depend on the locality, but the nature of the question, which
is to be tried by the law of nations.

The last case which I shall mention, as referred to by Mr.
J. *Buller,* was that of *Vanderwoodst* v. *Thompson,* decided
in the C. B. 1780. It was an action of trespass for entering
the plaintiff's ship on the high seas, and taking away goods;
and it was held, that as there was reason to suppose the
ship was a pirate, the action would not lie.

From all these cases Mr. J. *Buller* concluded, that the ques-
tion of prize or no prize, and the consequences of it, were
solely conusable in the Admiralty Court; that the inciden-
tal questions all depend upon the original question; that
if it was a seizure as prize, the common law does not take
notice of it as a trespass; and he concluded, that if the ori-
ginal taking be not a trespass conusable at common law, no
subsequent act, not even a decision of the admiralty that the
vessel was no prize, can give a common law jurisdiction.

I have thus given a full review of the celebrated and
leading case of *Le Caux* v. *Eden,* and it contains all the
principles that ought to govern the present case. It shows,
that if the original taking was as prize, the Court of Admi-

IN ERROR.
. . . . . . .
ALBANY,
January, 1819.

NOVION
v.
HALLETT.

IN ERROR.
.......
ALBANY,
January, 1819.

NOVION
v.
HALLETT.

ralty has the exclusive jurisdiction of the case, and that this jurisdiction is not affected by the fact, that the capture was illegal or violent, or unjust. It is sufficient, that the taking was in the assumed character of a hostile taking, as prize in war. The case further shows, that when the admiralty jurisdiction has once attached, by means of such taking as prize, it never can be devested by any matter subsequent, so as to give the courts of common law jurisdiction over the case as a tort or trespass. It is no matter what the captors do with the prize, or how the admiralty disposes of it. These are only consequences resulting from the taking, and the jurisdiction of them goes with the jurisdiction of the principal question. This case further shows, that if the original taking was even piratical, the exclusive jurisdiction belongs to the admiralty, and if that be the case in *England*, it is equally so here, for piracies are made exclusively cognizable by the Courts of the *United States*.

The reasons for establishing and for supporting this boundary line between the courts of common law and the admiralty, were forcibly urged by the counsel and the Court in the case of *Le Caux* v. *Eden*.

Such cases generally arise between native citizens, or subjects and foreigners, and it is highly expedient that they should be decided by general laws, known and adopted by every nation. Courts of common law are governed by local municipal laws, and are incompetent, as Lord *Mansfield* afterwards observed, in *Lindo* v. *Rodney*, (*Doug*. 613. *note*,) " to embrace the whole of the subject." Matters of prize, and of piratical capture, without regular authority, involve more or less the responsibility of the national government, and may affect the public relations of the country. It is, therefore, exceedingly fit that they should be discussed and tried in a court proceeding according to rules of national law equally known to every country, and which court is specially intrusted with the cognizance of such questions. In the report of Sir *George Lee*, Doctor *Paul*, Sir *Dudley Ryder*, and Mr. *Murray*, (afterwards Lord *Mansfield*,) in answer to the *Russian* memorial relative to the *Silesia* loan, (a state paper of great authority, and which Mr. *Vattel* calls an excellent piece on the law of nations,)

they say that, " by the maratime law of nations universally and immemorially received, there is an established method of determination, whether the capture be, or be not, lawful prize, and this is in a court of admiralty, judging by the law of nations and treaties." In this method, they say, " *all captures at sea* have immemorially been judged of in every country of *Europe ;* and that every other method of trial would be manifestly unjust, absurd, and impracticable."

If, however, the point was even doubtful, arguments from utility and public convenience ought to turn the scale. In a Prize Court all the claims of all the parties concerned may be embraced in one suit, for all may join in one libel, or any one interested may sue on behalf of himself and all the rest. But at common law every individual among the captors would be exposed to a separate action of trespass from every individual on board of the captured ship, and the inconvenience and expense of such a course of litigation would be intolerable. It may well be observed, in the words of Lord *Mansfield*, in *Le Caux* v. *Eden*, that "upon principles of law, convenience and sound policy, and also upon the authority of precedents, such an action could not be sustained."

The same question has since been frequently before the *English* Courts, and it has received the same decision.

Thus, in *Smart* v. *Wolff*, (3 *Term Rep.* 323.) after a condemnation in the admiralty of a cargo as prize, the neutral captain claimed freight of the captors, and the point was, whether a court of common law had jurisdiction of the question. It was determined by the K. B., after an able argument, that the question of freight was a matter connected with the original cause, and must be determined by the same Court which determined the principal question of prize. It involved in it the question of prize, as whether the goods were contraband, and whether the conduct of the neutral master had been such as justly to forfeit his title to freight, and it involved an inquiry into the foreign treaties applicable to the case, and the usage of nations. Mr. J. *Buller* said it was a waste of time to enter into reasons to show that the K. B. had no jurisdiction over the subject, and that every case that he knew of was a clear authority

IN ERROR.
.......
ALBANY,
January, 1819.

NOVION
v.
HALLETT.

to show that questions of prize, and their consequences, were solely and exclusively of admiralty jurisdiction Again; in the very recent case of *Faith* v. *Pearson*, (6 *Taunt.* 439.) the commander of a *British* ship of war was sued at common law for seizing and detaining the plaintiff's vessel, on suspicion of her being hostile prize, and partly on other grounds, as the want of a manifest and a supposed breach of the laws against the slave trade. It appeared that the defendant had, after the seizure, dismissed the vessel without libelling her; but Ch. J. *Gibbs* nonsuited the plaintiff, on the strength of the doctrine, in *Le Caux* v. *Eden*, and on the fact, that the vessel was originally taken as prize, and the Court of C. B. confirmed the nonsuit.

If the *Carthagena* schooner, in the present case, had no commission as a letter of marque, then, according to the charge of the judge, the taking of the plaintiff's brig was an act of piracy, and the plaintiff had still his civil remedy in the Supreme Court. I apprehend, that this, also, is a mistake, and that the admiralty court which has exclusive cognizance of the act of piracy, has also exclusive cognizance of the private injury, and this too, upon the general principle, that if a court has jurisdiction of the principal question, it has also of those incidental questions which may involve it.

It was the ancient doctrine, (*Case of the Admiralty,* 13. *Co.* 52.) that the admiralty alone could try the question of piracy, and that the common law courts could not take cognizance of the offence. And in a case mentioned by *Croke,* (*Cro. E.* 685. *Anon.*) as early as the 41st *Elizabeth,* a prohibition had been refused to stay a suit in the admiralty against the vendee upon land, for goods piratically taken at sea. The Court of C. B. unanimously admitted, that the suit in the admiralty was well brought. It was, indeed about the time of *James* I. contended and ruled, that if the property in goods, piratically taken, be changed by a sale on land, the jurisdiction of the admiralty, was gone. This was so resolved in the case of *Don Diego Serviento* v. *Jolliff;* (*Hob.* 78.) and Lord *Coke* says, it was also resolved, about the same time, in *Palache's* case, (4 *Inst.* 152. 153, 154.) that in a civil suit for goods taken piratically at sea,

the action must be in the courts of common law. But as to this last case, the report of it in *Bulstrode*, (3 *Bulst.* 27, 28, 29.) contains a very different doctrine; for it is there stated, that the purchaser of the goods alleged to have been piratically taken, was libelled in the admiralty by the true owner, and that the Court of K. B. held, that the owner had no remedy except in the admiralty, and refused a prohibition to stay the libel. We need not, however, rest a moment upon these contradictory, and, at this day, perfectly immaterial cases; for the doctrine has been long and clearly established, that where the admiralty has cognizance of the original taking, that jurisdiction is not defeated by any subsequent transactions on land. The cases already mentioned and referred to in the opinion of Mr. J. *Buller*, place this point beyond contradiction. To these may be added, the case of *Spark* v. *Stafford*, (*Hard.* 183.) in the 13th *Car.* II. in which a prohibition was denied to a suit in the admiralty for the reimbursement of ransom money paid to a pirate, on the ground that " the original cause arose upon the sea, and whatever followed, was but accessory and consequential, and, therefore, well determinable in the Court of Admiralty." So, in the case of *The King* v. *Broom*, (*Carth.* 398.) in which the king's proctor filed a libel in the admiralty, for the value of a prize which the captor had sold, and converted to his own use, a prohibition was denied, because " the admiralty had jurisdiction of the original cause, which was the capture. and the embezzlement was immediately upon the capture, and so all was one continued act."

After a review of these cases, which contain a course of doctrine and precedents very nearly uniform for the last two hundred years, it would seem that there could remain no doubt of the entire, and exclusive jurisdiction of the admiralty in the present case  Here is a suit in trover by the original owner of the brig and cargo against the captor, for property originally taken on the high seas in the character of a prize. It is not a mere incidental question that is raised, but the validity of the very act of capture is directly arraigned. The validity of the commission, the existence and authority of the newly created state of *Carthagena*, the

irregularity of the conduct of the privateer, in respect to the captured vessel subsequent to the capture, the unlawfulness of the mode in which she was originally fitted out, the *insult* to the government of the *United States*, the consequences of all, or any of these circumstances upon the legality of the prize, are so many grave questions involved in this suit. If ever a case was peculiarly fitted for a court of admiralty, sitting under the authority of the *United States*, and governed in its decisions by the laws and usages of nations, this must be that case.

I shall now take leave of the *English* decisions, and proceed to show what has been the doctrine in the *American* courts on this subject.

The case of *Doane* v. *Penhallow*, (1 *Dallas*, 218.) arose out of a transaction during the *American* war, and before the adoption of the present constitution of the *United States*. A brig and her cargo, taken as prize, had been condemned by a maritime court in *New-Hampshire*, and afterwards restored by the sentence of the Court of Appeals in prize cases established under a resolution of congress. The owners of the privateer, however, had converted the property to their own use, and an action at law was brought to recover from them the value of the property so converted.

This was as strong a case for the jurisdiction of the state court of common law as any that has been mentioned, and much stronger than the one now to be decided ; and yet, *Shippen*, president of the Court of Common Pleas in *Philadelphia*, and afterwards Chief Justice of that state, held, that no action at common law would lie, either for the original taking as prize, or for any of the consequences of it. He relied on the case of *Le Caux* v. *Eden* for that point, and also for the general doctrine, that for any matter happening consequential to the taking as prize, no suit would lie at common law. Though there had been a sentence of acquittal in the admiralty, yet the question of prize, or no prize, must still arise ; and he said, that it was not the time when the facts happened, but the connection they have with the original capture, and their being the necessary consequences of the capture, that gives the exclusive jurisdiction to the admiralty. The suit was therefore dismissed, on the

ground that the question in the action, if not directly a
question of prize, was one arising upon the immediate and
necessary consequences of the vessel being taken as prize.

In a subsequent case before the Supreme Court of *Penn-*
*sylvania*, (*Ross* v. *Rittenhouse*, 2 *Dallas* 160. 1 *Yates*, 443.)
the subject was brought incidentally into discussion, and all
the judges agreed in the general doctrine as to prize juris-
dictions ; and *Shippen*, then a judge of the court, observed,
" that it was not to be made a question, whether the courts
of admiralty have not exclusive jurisdiction over all ques-
tions of prize, or no prize ;" but he said further, that, " the
jurisdiction of the admiralty seemed to be exclusive in
many cases where the question of prize was at rest, as
where the admiralty has decided, that a ship taken is no
prize. In that case, it was not competent for a common
law court to sustain a suit for the illegal capture, but a new
libel is exhibited in the admiralty to compel the captors to
account to the captured." This point was said, also, by
the counsel in *Camden* v. *Home*, (4 *Term Rep*. 385.) to be
fully settled.

In a much more recent case in the Supreme Court of
*Pennsylvania*, the same doctrine was declared, and it was
decided, (*Cheriot* v. *Foussal*, 3 *Binney*, 220.) that a court of
common law had no jurisdiction of a cause, whose object
was to recover property taken and condemned as prize.
One of the judges observed, that the policy of excluding
the common law courts of the states from the cognizance
of these subjects, applied more forcibly here than it did in
*England*, because our State Courts were not like the Supe-
rior Courts of common law in *England*, courts for the whole
nation. It might also be added, that the whole national po-
licy and concerns of the country are confided to the fede-
ral government, and that the peace or character of the
country, in its foreign relations, might be peculiarly exposed,
by means of judicial decisions in prize cases, in which
foreigners are almost always concerned, if those cases were
left to the concurrent jurisdiction of the state courts. The
general government has no immediate superintendance of
those courts ; they are not clothed with admiralty powers,

IN ERROR.
·······
ALBANY,
January, 1819.

NOVION
v.
HALLETT.

and are governed in general by local usages unknown to the law of nations.

The same question has received a discussion and decision in the Superior Court of *South Carolina.* In *Sasportas v. Jennings & Woodrop,* (1 *Bay's Rep.* 470.) the defendants shipped a quantity of rum at *Jamaica,* on board a *British* sloop bound to *Charleston.* The vessel was taken on her passage by a *French* privateer and brought into *Charleston,* and the rum sold by the *French* consul as lawful prize, without any regular judicial condemnation. The claim of the defendants, as owners of the rum, and as *American* citizens, was rejected. At the sale, they purchased in the rum, and gave their notes, and being sued upon those notes, they pleaded specially the facts in the case, and that they were compelled by necessity to give the notes to get the property into their own hands; they also pleaded, that the state court, in which the action was brought, had no jurisdiction of the cause, as it involved the question of prize. To this plea the plaintiff demurred, and it was a point assumed upon the argument, that a court of common law could not take cognizance of a case which originally and exclusively belonged to the admiralty. The great point was, whether the Court could not take cognizance of a matter incidentally springing out of the question of prize. The Court (consisting of *Burke, Waties,* and *Bay,*) gave the subject a mature consideration, and they determined that, though a sentence of condemnation was necessary to vest the property, yet they had no jurisdiction of the case. They held, that the notes incidentally sprung out of the capture, and were a consequence of it, and depended upon the determination of the previous question of prize; they were the last links in the chain of events which was fastened to the admiralty jurisdiction, and could not be severed from the question of prize without manifest injustice to the defendants. The validity of the notes depended upon the title to the rum, which involved in it the consideration of prize, and they considered the case of *Le Caux* v. *Eden,* as being strong in point.

The case last cited, was certainly much more favourable to the pretensions of the courts of common law than the

one now under discussion, for the suit was upon notes given by the original owner to the captors, whereas, in the present case, the parties have not entered into any contract which is sought to be enforced. The action goes *directly* to the original taking, and charges the owner of the *Carthagenian* privateer with a wrong done by the capture, and that the brig and her cargo were not lawful prize.

If we look into the decisions of another state, (*North Carolina*) we shall find the same result. In *Simpson* v. *Nadeau*, (*Cameron and Norwood's Rep.* 115.) a *French* privateer took a brig under the pretence of a prize, and carried her into *Cuba*, and sold the brig and cargo. The plaintiff, as owner of the brig, sued the defendant as owner of the privateer, in a superior court in *North Carolina*, claiming the vessel and cargo as his property, and asserting that he was an *American* citizen. It was contended, on the part of the plaintiffs, that the courts of common law had, at least, a concurrent jurisdiction; but the counsel on the other side, (Mr. *Jocelyn*,) in a very elaborate and able argument, contended, that it was a clear principle that a court of common law cannot determine the question of prize, and that if the principal taking was as prize, a court of common law cannot entertain jurisdiction of any incident connected with it, and that the prominent feature in the case, viz. *was the brig a legal prize*, must be determined before the plaintiff could have judgment. That it was impossible to separate the supposed trespass arising from any subsequent irregularity from the principal taking, for it was one connected and entire transaction which could not be partitioned among different courts.

In giving his opinion, Judge *Hall* observed, that the question in the case was, prize or no prize, and of that the admiralty had the exclusive jurisdiction. That to understand the merit of the objection, that the subsequent acts of the party rendered him a trespasser *ab initio*, would be to go in search of foreign usages and national law, and that would be leading the Court out of its course. They were all questions for the prize courts, and he concluded that the defendant must have judgment, however strongly the justice

IN ERROR.
.......
ALBANY,
January, 1819.

NOVION
v.
HALLETT.

of the case might plead for the plaintiff. The other judges were of the same opinion.

The decisions which I have last reviewed, show that the law on this subject has been as well discussed, and as clearly settled in this country, as in *England*. It is, then, no longer to be doubted or questioned, that a State Court of common law jurisdiction, has no cognizance of the question of prize, or of any of its consequences, and that we have nothing to do with the subsequent treatment of the prize or the subsequent conduct of the parties. They are all points incidental to the main question, and involve a consideration of it. If property be once taken at sea by force, under pretence of being prize of war, there is no jurisdiction at common law of any possible question of right whatever resulting from such an act, and no refinement or distinction can devest the admiralty of its exclusive jurisdiction. The same doctrine applies, and the same consequences follow, if the taking be an act of piracy, and not of regular war. This has been abundantly shown from the *English* authorities. In addition to them, the government of the *United States*, and its judicial authorities have, by the constitution, the sole and entire cognizance of " all cases of admiralty and maritime jurisdiction," and of " piracies and felonies committed on the high seas, and offences against the laws of nations."

But the Ch. J. in delivering the opinion of the Court, said, that he placed his opinion, that the Supreme Court had jurisdiction of the cause, " upon the ground alone" that the privateer was illegally fitted out in a port of the *United States* in violation of the act congress of the 5th of *June,* 1794. The taking of this ground does not remove or lessen the difficulty of the case; and it will be found to be repugnant to the universal sense and practice of this country.

The act of congress made it a misdemeanour punishable by fine and imprisonment and the forfeiture of the vessel, for any person to fit out and arm within the *United States* any vessel to be employed in the service of any foreign power, with intent to cruise against the subjects of any other power with whom the *United States* are at peace. This act contains within itself a pretty plain intimation

where the power resided which has jurisdiction of cases arising under it; for it provides that the president of the *United States* shall employ such force as may be requisite to enforce the prohibitions of the act, and to take and detain any such vessel with her prizes, " and to the restoring such prizes in the cases in which restitution shall have been adjudged." It is very clear that the president was to employ the auxiliary force in aid of the process of the federal, and not of the state courts. It was in those courts that the restitution of the prizes taken by such vessels was to be *adjudged.*

This act of congress was, however, only an affirmance of the law of nations, and added more precise and specific penalties to the sanctions of that law. The government of the *United States* had declared, in 1793, before the passing of the act, that the original arming and equipping of vessels in our ports by any of the belligerent parties for military or naval service, was unlawful. Every such act was an infraction of the laws of neutrality which applied to our neutral situation.

Surely it belonged to the admiralty to take cognizance of such illegal armaments as incidental to the question of prize. It was as much a part of the prize question, as the inquiry touching the authority of the commission, or the place of the capture, or the national character of the party captured, or his title to the property. It was observed by Mr. J. *Ashhurst* in *Camden* v. *Home*, (4 *Term Rep.* 395.) that the courts of admiralty had not only exclusive jurisdiction over all questions of prize, but the same jurisdiction over all matters that arise incidentally, " either in *construing acts of parliament or proclamations,* in order to form their opinion on the principal question."

In the year 1793, when so many *French* privateers were commissioned, armed, and equipped in our ports, under the sanction of M. *Genet,* then minister from the *French* republic, it was clearly the sense of the profession and of the courts of this country, that cases of that kind were exclusively of federal cognizance. The great point of discussion then was, whether it belonged to the judicial or to the executive authority of the *United States,* to grant to the injured party relief against captures made by privateers so unlaw-

IN ERROR.
.......
ALBANY,
January, 1819.

NOVION
v.
HALLETT.

fully fitted out. . No person ever supposed at that day, that the state courts had any jurisdiction in the case. If these courts had been deemed possessed of the power, the parties aggrieved would gladly have resorted to them, when they found many of the admiralty courts declaring that the remedy was not even of a judicial nature, and that it lay with the president of the *United States*, and not with them. If the state courts had the jurisdiction, they could have afforded to the owner adequate relief, not only by the action of trespass or trover, for damages, but by the action of replevin for the property tortiously taken.

In the case of *Findlay* v. *The Ship William*, (1 *Peter's Adm.* 12.) a libel was filed in the district court of *Pennsylvania*, alleging that the ship was captured by a *French* privateer called the *Citizen Genet*, within the territorial jurisdiction of the *United States ;* and in the case of *Moxon* v. *The Brigantine Fanny*, (2 *Peters's Adm.* 309.) a libel was filed in the same court, for a like capture by a *French* privateer called the *Sans Culottes*. In both these cases, the libels were dismissed on the strange ground, that matters of that kind appertained to the executive department, which was charged with the duty and the power of vindicating the sovereignty of the nation. It is to be remarked, that both those privateers had been armed and fitted and commissioned within the *United States* ,contrary to the declared sense of the government, and equally contrary to public law.

In *May* and *June*, 1793, the President of the *United States* had caused to be seized several *French* vessels, armed and commissioned in our ports, to cruise against their enemies, and had directed prosecutions against all concerned therein : And Mr. *Jefferson*, then secretary of state, in his letter to citizen *Genet*, of the date of the 7th of *August*, 1793, informs him, that the *United States* were bound to indemnify for all prizes made by *French* vessels so illegally fitted out, and to restore the prizes, if possible. In another case, the District Court of *New York*, in 1793, made a similar decision with those in *Pennsylvania*. The *Catharine*, a *British* vessel, was taken by a *French* frigate, within the waters of the *United States*, and she was arrested under process from that Court, issued at the instance of the *British* owner, on

the ground that she was not lawful prize. This case was very ably argued in support of the power and duty of the District Court to afford the remedy. But Judge *Duane*, in an elaborate opinion, decided, that the cognizance of causes respecting the sovereignty, and rights of neutrality of the *United States*, belonged to the executive, and not to the judicial branch of the government, and the libel was, consequently, dismissed.

IN ERROR.
.......
ALBANY,
January, 1819.

NOVION
v.
HALLETT.

Similar decisions were made by the District Courts of *Maryland* and *North Carolina*.

In the case of *Glass* v. *The sloop Betsey*, the *French* privateer, *Citizen Genet*, had captured a *Swedish* vessel and cargo, owned by neutral *Swedes*, and by *American* citizens, and had sent her into *Baltimore*. The owners filed a libel in the District Court of *Maryland*, claiming restitution. The Court there also held, that it had no jurisdiction.

This extraordinary doctrine of the District Courts, renouncing all jurisdiction of their own, and insisting that such cases were exclusively of executive cognizance, gave much embarrassment to the government. The privateer *Citizen Genet*, which had made most of the captures complained of, had been fitted out at *Charleston*, in *South Carolina*, and after being required to leave the *United States*, she went out of port, says Mr. *Jefferson*, in his official letter of the 16th of *August*, 1793, " to cruise on our coast, and to brave the authority of the country, by returning into port again with her prizes." And in his official note to Mr. *Genet*, of the 22d of *November*, 1793, he informs him, that the government of the *United States* were bound to cause restitution to be made of the three prizes taken by the privateer *Citizen Genet*, and brought into the *United States*, or to make compensation to the owners.

President *Washington*, in his speech to congress, of the 3d of *December*, 1793, makes a particular allusion to the case of these vessels, illegally commissioned, or equipped in a warlike form, within the limits of the *United States*. He then mentions the doubts of several of the courts as to their power to liberate in cases of certain captures, and he recommends to congress to regulate their jurisdiction in these points, and suggests, that the remedies will be well

administered by the *judiciary*, who possess a long-established course of investigation, effectual process, and officers in the habit of executing it. But, says he, " if the executive is to be the resort in these cases, it is hoped he will be authorized by law to have facts ascertained by the courts, when for his own information he shall require it." 

It is very evident, that President *Washington* thought the power of redress, in these cases, ought not to be lodged with him, but that it ought to be exercised by the courts of justice. And, fortunately, before congress had time to make provision for the case, the Supreme Court of the *United States*, in *February*, 1794, in the case of *Glass* v. *The sloop Betsey*, (3 *Dallas*, 6.) had the very litigated question brought up in review before them. And that Court, at the head of which was Ch. J. *Jay*, unanimously decided, that the District Courts had competent jurisdiction in all these cases, and possessed all the powers of a Court of Admiralty, whether considered as an Instance, or as a Prize Court. This was one of the most salutary decisions, perhaps, ever made by the Supreme Court of the *United States*. The anomaly raised in the District Courts disappeared forever, and the course of public and national law flowed in its accustomed channel. After this we find, by the case of *Talbot* v. *Janson*, (3 *Dallas*, 133.) that the *French* privateer *L'Ami de la Liberté*, was owned, fitted out, and armed in the *United States*, under a *French* irregular commission, and took a vessel belonging to citizens of *Holland*, and brought it within the *United States*. The *Dutch* claimants libelled the vessel and cargo in the District Court of *South Carolina*, and restitution was awarded. So, in the case of the *United States* v. *Le Vengeance*, (3 *Dallas*, 297.) where a *French* privateer captured, and brought into *New-York*, a *Spanish* ship, the *Spanish* owner, and the attorney for the *United States*, equally resorted to the *District Court*, the one for restitution of the prize, and the other for forfeiture of the privateer, on the same ground, viz. that the privateer had been illegally fitted out in the *United States ;* and the Supreme Court of the *United States*, upon an appeal as to the information, decided, that it was a civil cause of admiralty and maritime jurisdiction.

Within the same principle was the case of *The United States* v. *The schooner Sally*, (2 *Cranch*, 406.) for being concerned in the slave trade, contrary to the act of congress. It was there held, that it was a case, not of common law, but of admiralty jurisdiction.

In short, after this history of the struggle between the judicial, and the executive authorities of the Union, in respect to the rightful control over illegal captures, and particularly of captures made by vessels illegally fitted out within the *United States ;* and after the most solemn sanction finally given to the power of the district, or admiralty courts, over this subject; and after the irresistible deduction from these facts, that the common law courts of the individual states have no jurisdiction in the case, I think I may safely conclude, that the ground taken by the Chief Justice in his opinion, (and which appears not to have been taken at the trial,) is as untenable as any that could have been assumed.

I am, accordingly, of opinion, that the judgment of the Supreme Court ought to be reversed.(*u*)

This being the unanimous opinion of the Court, it was thereupon ORDERED and ADJUDGED, that the judgment of the Supreme Court be reversed; and that the defendant in error pay to the plaintiff in error, two hundred and thirty three dollars and 24 cents, for his costs and charges in and about prosecuting his writ of error in this Court. And it is further *ordered* and *adjudged,* that the proceedings and judgment of this Court be remitted to the said Supreme Court, to the end, that the said Court may award a *venire de novo* of and upon the said issue and proceed according to law.

(*u*) Had the fitting out of the capturing vessel, in this case, not been accompanied with a violation of our neutrality and laws, it is clear, that the question would have belonged exclusively to the courts of the country of the captor; it is only the illegality of the original equipment which can give to our courts admiralty jurisdiction of the case. Vide *L'Invincible,* 1 *Wheaton,* 238.