[Philadelphia, April 24th, 1841.]

HUMPHREYS and Others *against* REED.                 6 Wh 435 | 27 SC 353 |

IN ERROR.

The plaintiff, who was the owner of a canal boat, received and gave a receipt for certain casks of nails, in good order, &c., which he agreed to deliver (the dangers of the navigation excepted) in the like good order and condition to W. L., No. 17 Walnut st., Philadelphia, he paying freight for the same at a certain rate. On the voyage to Philadelphia, the boat struck against a stone in the bottom of the canal, by which a hole was knocked in her bottom, and the nails became wet and damaged. On her arrival in Philadelphia, the captain of the boat delivered the nails at the wharf of the defendants, who were forwarding and commission merchants, with instructions not to deliver them until the freight was paid. The defendants however delivered the nails to W. L. without receiving the freight. In trover for the nails, it was *held*, (1) That the defendants had a right to show that in consequence of the unskilfulness or negligence of the persons employed in the management of the boat, the plaintiff was not entitled to recover the stipulated freight; (2) That the carrier was not bound to show that his boat was watertight and sound at the beginning of the trip; (3) That the delivery on the wharf of the defendants was not in this case a delivery to W. L.; (4) That it was a question of fact for the jury, whether the injury to the nails was occasioned by the negligence or fault of the persons employed on the boat, or came within the exception of the dangers of the navigation. (5) That the captain and steersman of the boat were not competent witnesses for the plaintiff without a release.

Error to the District Court for the City and County of Philadelphia, to remove the record of an action on the case brought by Alexander Reed against Charles Humphreys, E. G. Dutilh, and Wm. Carlisle, trading as Humphreys, Dutilh & Co.

The plaintiff declared in trover for 500 kegs of nails. Plea not guilty.

The cause came on before Stroud, J., on the 25th of November, 1839, when the plaintiff gave in evidence the following depositions, after objection on the part of the defendants, which was overruled.

Isaac M'Kinley Reed deposed as follows.

" I was master of the canal boat of Milton named the Good Intent, in April, 1838, and still am. Alexander Reed owns the boat. She started in April, 1838, from Farrandsville; she had 500 kegs of nails on board, shipped at Farrandsville by Charles F. Pearson to Wm. Lyman. This exhibit shown to me, marked A., is the manifest and bill of lading signed by plaintiff, and handed to me as the master of the boat. Shortly afterwards we started on our voyage to Philadelphia. The crew consisted of myself as master, John H. Maffitt as steersman, and James Dergeman, driver. That is the ordinary complement of a canal boat. This was the first trip of the season. The water had not been let into the canal, I think, over a month. After we had left home a few days, coming under a bridge between 8 and 9 o'clock in the morning, we struck on a stone or some sunken thing in the bottom of the canal, which I could not discover; it could not be seen. The boat was in the customary place of running; as near the centre of the canal as could be guessed at. John H. Maffitt was at the helm. I was on board the boat not doing any thing in particular. The steersman was watching the head of the boat, keeping her steady and straight in the canal. I had no means of discovering or preventing the accident. It knocked a hole in the bottom of the boat in one place, and cracked a plank in another; the water got in; it wet 199 kegs of the nails, which were all that I could see were injured. There was no other cargo on board. On our arrival in Philadelphia, I took the boat to Walnut street wharf on the Schuylkill, which is the wharf of the defendants: they are forwarding and commission merchants. I went to Mr. Hoffman, one of the clerks of the defendants in their store, and asked him where I should deliver the nails. He then told me to deliver them in the shed on the wharf, which I did. Shortly afterwards he gave me the receipt marked B. Before that time, I had been to see Mr. Horatio Etting, the agent of Mr. Wm. Lyman, to see him and know what he wished done with the nails that were wet. He said we would have to have the nails unloaded, and the damages appraised. I asked him for the freight which amounted to $250, which he refused to pay; alleging that the nails were damaged. I asked him again for it on another day, and received the same refusal and the same reason, and wanted Capt. Reed to bear whatever damage they had sustained. I communicated to Mr. Carlise, one of the defendants, that some of the nails were damaged, and that Mr. Lyman had refused to pay the freight. As soon as I ascertained that they would not pay me the freight, I gave Mr. Hoffman orders not to deliver the nails to any one until I gave him further orders. I then started for home. I next returned to Philadelphia about the latter part of May or 1st of June. I called upon defendants to see if the nails were there. I saw Mr. Carlisle; he said he

had delivered the nails to Wm. Lyman.   He said he did not know
the nails were in dispute.   I had told him before I went away that
the nails were damaged, and that they had refused to pay me the
freight.   Exhibit marked C. is a copy of the note written by plain-
tiff's counsel to Mr. Lyman, demanding the freight and notifying
him that the nails were in store at his risk and expenses; and that
they would not be delivered until the freight and storage were fully
paid; and other matters therein stated.   The original of which I
delivered to Mr. Lyman personally on the 26th April, 1838, and on
the next day made affidavit on the said copy."   Cross-examined.—
" The accident happened two or three miles from Watsons-town, in
Northumberland county.   It was under a farm bridge.   The navi-
gation had been opened from three weeks to a month.   But very
few boats had passed that I had a knowledge of.   There was nothing
peculiar in the shape of the canal at that place that I recollect.   I
cannot tell which lot of nails was injured.   There was no person
present at either of the conversations I had with Mr. Carlisle.   There
were persons passing and repassing.   I think I had arrived two days
before I got the receipt from Mr. Hoffman.   The boat was lying at
Mr. Humphreys's wharf, and the nails were on the wharf before I
got the receipt.   I don't recollect whether I ever showed the receipt
marked B. to Mr. Etting or not, but I think I did when I demanded
the freight.   I left here on my return to Dunnsbury, about the last
of April or 1st of May."   Re-examined.—" When I left on this trip
returning, the nails were still in the shed, on the preceding evening."

John Hill Maffitt deposed that " He was steersman of canal boat
Good Intent, on her trip to Philadelphia, in April, 1838.   This is the
second summer that I have run a canal boat.   Isaac Reed was the
master of the boat.   He has followed running canal boats three
years to my knowledge.   We were running along the canal as usual
between 8 and 9 o'clock in the morning ; our boat struck something
at the bottom of the canal, which I suppose was a stone.   I was
standing at the helm at the time.   I cannot say whether he was on
deck or below.   I did not know any thing of the accident until we
struck the stone, after which I did all in my power to save the nails.
I do not know of any accident having happened before in that place
during the season.   I had ran over the same ground the previous
season, and had not heard of any accident having taken place
there."   Cross-examined.—" I am engaged by the summer on board
this boat, at so much a month, and work at his farm when the boat
don't run.   This boat had two horses to it.   This was a Union
Canal boat—an open boat.   The injury took place about 5 or 6 feet
from her bow, as near as I could tell.   I think it was middling clear
weather.   The accident happened about 16 miles above Northum-
berland, on the West Branch canal."   Re-examined.—" I was not
far off when I heard Isaac Reed tell one of the clerks belonging

*(Humphreys v. Reed.)*

there, at the wharf, not to deliver the nails until further orders; but I do not know whether they saw me or not. I was not paying much attention. I heard it accidentally."

The following are the papers referred to in the deposition of the witnesses:

A.

"Invoice of three hundred and five casks nails and spikes shipped by Charles F. Pearson, agent, on board boat Good Intent, John Reed, master, and consigned to W. Lyman, 17 Walnut street, Philadelphia."

[Here follows a list of the kegs, &c.]

"Received, Farrandsville, April 6, 1838, of Charles F. Pearson, agent, three hundred and five casks nails in good order and well conditioned, which (the dangers of the navigation excepted) I agree to deliver in the like good order and condition to W. Lyman, Esq. No. 17 Walnut street, Philadelphia, he paying me freight for the same at the rate or fifty cents per keg; and also the same rate on the 195 (one hundred and ninety-five) casks for Messrs. Bevan & Humphreys.

                    (Signed)        ALEX. REED."

B.

"Received per Good Intent, of Capt. Reed, five hundred kegs nails (in shed.)

                              HUMPHREYS, DUTILH & Co.
April 21, '38.                ' per C. J. HOFFMAN."

C.

"Mr. W. Lyman.—Sir:

On behalf of Capt. Alex. Reed, we are instructed to demand from you the payment of two hundred and fifty dollars, the amount due by you to him, for the freight of 500 kegs nails from Farransville to Philadelphia; which nails are now in store at your risk and expense, and will not be delivered until the said freight and storage are fully paid. We are further instructed to notify you that unless the same be fully paid to us on or before the 8th May, 1838, it is his intention to expose the said nails to sale by public auction at your risk, and on your account; and he will hold you answerable for any loss that may ensue.                Yours, &c.
                    (Signed)        VOGDES & PHILLIPS,
                                     Attorneys, &c.
Philada. 26th April, 1838.           No. 104 Walnut street."

The defendants produced no evidence. Their counsel requested the court to charge,

"1. That the plaintiff could not recover the goods, because he

(Humphreys v. Reed.)

had not earned his freight by carrying them according to the terms of the bill of lading.

2. That the plaintiff could not recover, if the nails had been injured by the negligence of the boatmen, to an amount greater than the amount of freight claimed.

3. That where a carrier alleged that an injury had occurred by a danger of the navigation, he was bound to show his vessel seaworthy, at least so far as respects the danger from which the injury occurred.

4. That delivery on the wharf was a delivery to the owner, and the lien for freight was gone.

5. That striking upon a stone in the canal was not a danger of the navigation excepted by the bill of lading.

6. That if freight was for any reason not due and payable, the plaintiff could not recover."

The learned judge however charged that these points had no application whatever to the suit. He said that if the plaintiff, as owner of the boat, had sued Mr. Lyman for the freight, they might have deserved some consideration; but were to be thrown out of the present case by the jury.

The jury found for the plaintiff $273 54 damages. Whereupon, the defendants took this writ of error.

The following errors were assigned:

" I. Because the judge admitted the evidence of J. McKinley Reed and John H. Maffit, the one the master and the other the steersman of the boat, in which the nails were carried.

II. Because the judge charged the jury that they were not to take into consideration the following points, made by the defendant's counsel, viz.

1st. That the plaintiff was not entitled to recover in this suit, because he had not carried the goods according to the terms of the. bill of lading.

2d. That if the nails were injured, by the neglect or negligence of the boatmen, to an amount equal to or greater than the freight claimed, the plaintiffs are not entitled to recover.

3d. That where a carrier alleged that an injury had occurred, by a danger of the navigation, he was bound to show his vessel sea-worthy, at least so far as respects the danger from which the injury occurred.

· 4th. That delivery on the wharf was a delivery to the owner, and the lien for freight was gone.

5th. That striking upon a stone, in the canal, was not a danger of the navigation, excepted by the bill of lading.

6th. That if. freight was for any reason not due and payable, the plaintiff could not recover."

Mr. *Williams,* for the plaintiff in error, cited *Robertson* v. *Stewart,* (5 *Watts,* 449.) *Bartram* v. *McKee,* (1 *Watts,* 39.) 3 *Esp. N. P.* 114; *Ogles* v. *Atkinson,* (5 *Taunt.* 759; 1 *Eng. Com. Law Rep.* 255.) *Clemson* v. *Davidson,* (5 *Binn.* 399.)

Mr. *J. A. Phillips,* contra, cited *Ostrander* v. *Brown,* (15 *Johns. Rep.* 39.) *Gordon* v. *Little,* (8 *Serg. & R.* 533.) *Atwood* v. *Reliance Co.,* (9 *Watts,* 87.) *Hart* v. *Allen,* (2 *Watts,* 117.) *Leech* v. *Baldwin,* (5 *Watts,* 446.)

The opinion of the Court was delivered by

KENNEDY, J.—This is an action of trover for five hundred kegs of nails, in which the plaintiffs in error were defendants in the District Court, where it was commenced and tried, and the defendant in error plaintiff. The latter being the owner of a canal boat, called the Good Intent, had been employed by Charles F. Pearson, agent, to convey, by his boat, the nails, on the canal, from Farrandsville to Philadelphia, there to be delivered to W. Lyman, Esq., No. 17 Walnut street, upon his paying the defendant in error freight for the same at the rate of fifty cents per keg. The defendant in error by his written engagement, made on the 6th of April, 1838, after having received the nails, bound himself to do so. He accordingly sent his boat on with the nails, in charge of Isaac McKinley Reed as captain, and John Hill Maffit as steersman of it. They arrived with the boat and the nails at Philadelphia, about the 22d of the same month, at the Walnut street wharf, then in possession of the plaintiffs in error. The nails were in good order when received by the defendant in error, but in the course of the transportation had, from some cause, received wet, and in consequence thereof were in a damaged state when brought to the wharf. Lyman did not, as it would appear, refuse to receive the nails; on the contrary, he was willing to do so, but objected to paying the freight, which the captain of the boat, as the agent of the defendant in error, claimed before the value of the injury done to the nails should be ascertained, so that it might be deducted from or set off against the freight. The captain of the boat, however, would not accede to this.; and instead of delivering the nails to Mr. Lyman, he left them in charge of the plaintiffs in error, taking a receipt from their clerk for having done so, without specifying the purpose or object of the

(Humphreys v. Reed.)

deposit. The plaintiffs in error afterwards, upon the demand of Mr. Lyman, delivered the nails to him. Now it is perfectly obvious, from this exhibit of the case, that the only interest or claim which the defendant in error could have in the nails, as against Mr. Lyman, was the amount of his freight, say two hundred and fifty dollars; and this sum, with interest thereon, appears to be what the jury gave their verdict for against the plaintiffs in error. This action, therefore, though trover, would appear to have been brought for the purpose of recovering the amount of the freight claimed by the defendant in error. So far, then, as the attainment of justice would seem to have been a matter of concern in the cause, the main question presented in it was, had the defendant in error a just right to demand and receive freight, and if he had, what amount? But the learned judge, before whom the cause was tried, appears to have been of opinion that it was not competent for the plaintiffs in error, in the form of action adopted here, it being trover, against them, to make this question a ground of their defence. The second error assigned contains an exception to the opinion of the judge on this point; and I will consider it first, because if it shall be made to appear, that the plaintiffs in error had a right to show that the defendant in error, in consequence of the negligence or unskilfulness of those employed by him to conduct his boat, had not fulfilled his contract, for carrying the nails, in such a manner as to entitle him to receive the stipulated freight, and that it was competent for them to interpose this as an objection to his recovery, it will not be difficult to show that Isaac McKinley Reed and John Hill Maffit were incompetent witnesses for the defendant in error, without having a release from him first. Indeed, I am inclined to believe that his honour the judge, on the trial, would have held them incompetent, had he considered the matter just mentioned an available defence for the plaintiffs in error. It appears that the defendant in error, by the terms of the receipt which he gave for the nails, expressly undertook to deliver them to Mr. Lyman in Philadelphia, at No. 17 in Walnut street, upon being paid the amount of the freight therein mentioned. Now suppose that the defendant in error, or his authorised agent, after having received the freight from Mr. Lyman, had refused to deliver the nails, and Mr. Lyman had thereupon taken possession of them, it will not be pretended that the defendant in error could have maintained any suit or have had any claim against him for doing so. Or suppose that Mr. Lyman, instead of taking possession, had brought an action against the defendant for a breach of his engagement, it cannot be questioned that he would have been entitled to recover. *Griffith* v. *Ingledew*, (6 *Serg. & R.* 429.) *Evans* v. *Martlett*, (1 *Ld. Raym.* 271. 12 *Mod.* 256.) But if the defendant in error or his agents have, through want of skill or proper care and attention on their part in the transportation of the nails, been the occasion of their having received an injury lessening their value

to the full amount of the freight, it is then equally clear and unquestionable that he has not entitled himself to demand and receive it. This proposition is not only clear upon principle, but well settled by abundance of authority. By the express terms of his contract, he was to deliver the nails in the like good order and condition in which they were when he received them, unless injured by the dangers of the navigation. This exception cannot be said to embrace an injury or damage arising from negligence or want of skill on the part of the defendant in error or his agents; so that if the nails received injury, from both or either of these two latter causes, equal in value to the amount of the freight agreed to be paid, the defendant in error has failed to perform the condition, or at least one of the conditions, upon which his claim to the freight was to arise, and therefore, according to the terms of his contract, cannot claim the freight in law. Neither can he pretend any claim to it in equity or good conscience, seeing he has occasioned a loss to the owner of the iron equal in value to the amount of the freight. If it be, then, that he has no claim to the freight, it is impossible to conceive any ground upon which he would be justified in withholding the nails from Mr. Lyman, who must be regarded as the legal owner of them. Hence he would be bound to deliver the nails without making such a claim; and if he had delivered them without making it, or saying any thing about it, he would not be entitled to maintain an action for the recovery of it. This doctrine will be found to be fully sustained by the following cases: *Bartram* v. *McKee*, (1 *Watts*, 39.) *Leech* v. *Baldwin*, (5 *Watts*, 446.) *Gogel* v. *Jacoby*, (5 *S. & R.* 122.) Then, if the defendant in error has no claim to freight for the transportation of the nails, upon what ground can he support an action either for it or for the nails, against the plaintiffs in error; since Mr. Lyman, to whom he was bound to deliver the nails, has received them and is satisfied. If he has no right to demand and receive the freight, he can have no lien on the nails or right to maintain an action for them on that account against either Mr. Lyman or the plaintiffs in error. If he has no right to freight, and consequently has received no actual damage by the plaintiffs in error having delivered the nails to the person entitled to receive them, and to whom the defendant in error was bound himself to have delivered them, the only possible ground upon which he can, with the least shadow of right in law, claim to sustain this action, is that of his having acquired a special property in the nails as a carrier of them, and having delivered them to the plaintiffs in error as his bailees. But as a carrier, he could only claim the nails for the purpose of discharging his engagement or trust by delivering them to the consignee. This, however, has been done by the plaintiffs in error for him, so that he has no ground of complaint. or action on that score. And as to any obligation which the plaintiffs in error were under to him by his bailment of the nails to them, that

(Humphreys v. Reed.)

is also discharged, if he has no claim to freight, by their having delivered the nails to the consignee, who had the right to demand and receive the nails, or the value of them, from either the plaintiffs or the defendant in error. The bailor in such case, who has no right to withhold the possession of the goods from the right owner or consignee, can maintain no action against his bailee for having delivered them to such owner or consignee upon their being demanded. This we have decided during the present term, in the case of *King et al.* v. *Richards et al.*,* to which I beg leave to refer for the reasons advanced and the authorities cited in support thereof. On this point, we therefore think that the District Court erred in the instruction which it gave to the jury; which disposes of the first, second and sixth specifications under the second error.

As to the third specification, it is doubtless true that every carrier of goods, on board of a vessel at sea or other water, is considered under an implied promise at least, if not an express one, that the vessel is seaworthy. But I am not aware that the circumstance of the goods, on board, having become injured by water, would of itself be evidence sufficient to warrant the jury in finding that the promise of seaworthiness was broken, unless the carrier made it appear otherwise by the production of evidence on his part. The requisition that the vessel shall be tight and strong, and fit for the purpose for which it is offered by the carrier, arises from the promise, on his part, implied by law, if not expressed, to that effect; and it would be unreasonable to presume or infer a breach of such promise, or indeed of any promise, without evidence adduced showing directly that it was so, or proving some circumstance or fact from which it might naturally and fairly be inferred. Now it appears to me that the nails might have become wet in various ways, and thus have received the injury complained of, without the boat, in which they were on the canal, being in the least deficient, but, on the contrary, perfectly tight, staunch and strong; and if so, it might be doing great injustice to infer a breach of the promise from that circumstance. We therefore do not conceive that it would have been right in the court to have instructed the jury as requested on the point referred to in the third specification. See *Amies* v. *Stevens*, (1 *Stran.* 128.) *Lyon* v. *Mells*, (5 *East*, 428.) *Abbot on Shipping*, 225. We also think that it would have been error in the court to have instructed the jury as requested by the counsel of the plaintiffs in error on the point mentioned in his fourth specification. The receipt, taken by the captain of the boat for the delivery of the nails to them, does not show that they were delivered for the use of the consignee, nor any thing like it. In truth, it does not appear from the face of the receipt itself for what purpose they were

* *Ante,* page 418.

so delivered. Neither does it appear that any other evidence was given tending to prove that they were delivered for the use of the consignee. Neither do the plaintiffs in error appear to have been the agents of the consignee; nor was their wharf the place appointed for the delivery of the nails: No. 17, in Walnut street, is expressly mentioned for this purpose in the defendant in error's engagement. There appears, therefore, to be no ground for saying that a delivery on the wharf of the plaintiffs in error was a delivery to the owner or consignee.

Then in regard to the fifth specification, which charges the court with error because it did not instruct the jury that the boat's striking upon a stone in the canal was not a danger of the navigation excepted by the bill of lading. Now the striking of the boat upon a stone or rock in the canal may or may not fall within the exception. Whether it would or not, must always depend upon the particular circumstances attending it, either going to show that it happened in consequence of some fault on the part of the master or those who were entrusted with the management of the boat, or that it occurred without any default in them. In this latter case, the loss occasioned by the striking of the boat against the stone would seem to come fairly within the exception; but in the former, it would be clearly chargeable to the master or owner of the boat. For instance, if the stone, from its position, may be readily seen and avoided by those having the conduct of the boat; or although not visible, yet *if its situation be generally known*, the loss ought to be imputed to the fault of the captain or those having the direction of the boat. But if, on the other hand, the circumstance of the stone being in the canal was not generally known, and unknown to the party having the command of the boat, and was *invisible to the common eye*, the loss occasioned by the boat's striking upon it ought to be considered as coming within the exception, which embraces all dangers of the navigation. See *Abbot on Shipping*, 257. It was not, therefore, for the court to give such instruction as was asked for on this point; because in either case, it was a question of fact to be referred to the decision of the jury. But it may be observed that, in the absence of testimony acquitting the captain, or master of the boat, of all blame or default upon his part, the jury may presume that the *loss* was occasioned from his negligence or carelessness, and therefore make him or his employer liable for it. *Beckman* v. *Shouse*, (5 *Rawle*, 189, 190.)

Having now disposed of all the specifications under the second error, the first remains to be considered. The question raised in it is, were the captain and steersman of the boat competent witnesses for the plaintiff below, without a release from him? "Although," says Mr. Starkie, in his Treatise on Evidence, 1 vol. 113, " an agent who has actually executed the business of his principal is, as it would seem, in all cases competent to prove that he acted according to

the directions of the principal, on the ground of necessity, and because the principal can never maintain an action against his agent for acting according to his own directions, whatever may be the result of the cause; yet if the cause depend upon the question, whether the agent has been guilty of some tortious act, or some negligence in the course of executing the orders of the principal, and in respect of which he would be liable over to the principal if he failed in the action, the agent is not competent without a release." The principle thus laid down by Mr. Starkie, seems to be not only reasonable, but to have the support and sanction of judicial authority. See *De Symonds* v. *De la Cour*, (5 *Bos. & Pull.* 374.) So, in accordance therewith, it was held in *Green* v. *The New River Company*, in an action against a master for the negligence of his servant, that the latter was not a competent witness to disprove the negligence without a release. 4 *T. R.* 589. See also to the same effect, *Miller* v. *Falconer*, (1 *Camp.* 251.) *Morish* v. *Foote*, (2 *Moore*, 508.) *Wake* v. *Lark*, (5 *C. & P.* 454.) *Kerrison* v. *Coatsworth*, (1 *C. & P.* 645.) *Whitamore* v. *Waterhouse*, (4 *C. & P.* 383.) *Sherman* v. *Barnes*, (1 *M. & Rob.* 69.) *Spitty* v. *Bowens*, (*Peake*, 53.) So in *Harrington* v. *Coswell*, (6 *C. & P.* 352,) Mr. Justice PATTESON held that the servant of the carrier, against whom the action was brought for negligence of the servant in carrying a parcel, was not a competent witness, nor made so by the statute 3 & 4 Will. 4, c. 42, s. 26. Now, although the present is not an action brought by the owner of the goods against the carrier for a loss sustained through the negligence of those employed by the carrier to convey the goods, yet negligence on their part was properly made the ground of the defence against the carrier's claim for freight; so that the case depended, in the language of Mr. Starkie, upon the question whether the agents of the party introducing them as witnesses on his behalf, had not been guilty of some negligence in the course of executing his orders. They had, from their position, the entire management and direction of the boat; and if by their negligence, their employer was alleged to have lost his right to recover, from the owner or consignee of the nails, the freight agreed to be paid for their transportation, it is evident that they stood liable to him for the loss, in case he failed to recover on that account, and consequently were interested in promoting his recovery of the freight from the plaintiffs in error, by bearing testimony to the fact of their being no negligence on their part, and showing that the injury to the nails had arisen from some other unavoidable cause. We therefore think that the depositions of Isaac McKinley Reed and John Hill Maffit were improperly admitted. The judgment is reversed, and a *venire de novo* awarded.

   Judgment reversed; and a *venire de novo* awarded.