## BEFORE CHIEF JUSTICE LEE.—IN ADMIRALTY.

## LA MOTTE AND DUPERTAIL vs. B. F. ANGEL, U. S. Consul.

In a suit to recover the freight of goods, the consignee may set-off damages arising from the negligence of the carrier.

Held : that the carrier was not liable for damage from " sweating," the vessel being furnished with proper dunnage, and the goods well stowed.

If merchandise in good order is entrusted to a carrier, and it arrives at its destination in a damaged state, the carrier is responsible, unless he can show that the damage is not the result of his negligence.

The measure of damages for goods lost, is the net price which they would have brought at the port of destination.

This is an action for the freight of goods conveyed from Valparaiso to Honolulu in the plaintiffs' vessels, and before proceeding to the consideration of the questions in controversy between the parties, it may be proper to state the main facts of the case.   It appears that on the 7th of January, 1854, James D. Johnson, U. S. Naval Storekeeper at Valparaiso, shipped on board the plaintiffs' vessel, the schooner "Perla," to be delivered to B. F. Angel, United States Consul at Honolulu, 450 bags of biscuit, 90 bags of flour, and 91 bags of beans, making in all 55 19-20th tons, for which freight was to be paid at the rate of $25 per ton.   It further appears that on the 16th January, 1854, the said Johnson shipped on board the plaintiffs' vessel, the schooner "Adele," 150 bags, or 15 tons of biscuit, to be delivered to B. F. Angel, U. S. Consul at Honolulu, he paying freight for the same at the rate of $25 per ton.

The goods, as appears by the bills of lading, were shipped "in good order and well conditioned," and were to be delivered "in the like good order and condition, all and every danger and accidents of the seas and navigation, of whatever nature or kind, excepted."   The vessels put into the port of Papiete, Society Islands, where the "Adele" transhipped part of her cargo to the "Perla," and the balance she forwarded by the French ship "Nil."

On the arrival of the "Perla" and "Nil" at the port of Honolulu, the plaintiffs delivered to B. F. Angel, U. S. Consul, 438 bags of bread, 37 bags of beans, and 25 bags of flour, and tendered the delivery of the balance of the goods shipped, with the exception of 20 bags of bread shipped by the "Nil," which were lost.   The defendant refused to receive the balance of the goods tendered, on the ground that they were not in the like good order and condition as when shipped, but in a spoiled and damaged state, occasioned not by any danger or accident of the seas, but by the negligence of the plaintiffs and their agents in the course of the voyage.   The damaged goods being perishable, were sold at public auction for the benefit of whom it might concern, and the plaintiffs then presented their bill for full freight, except for the 20 bags of bread that were missing, which the defendant refused to pay, on the ground that the plaintiffs were liable to him for damages and non-delivery of a portion of the cargo, to an amount exceeding the freight claimed.

There is no doubt that the bread, flour and beans not delivered, were very badly damaged, but whether the damage arose from the

negligence of the plaintiffs, or from the dangers and accidents of the sea, is a question of dispute ; and before we proceed to determine that question we must settle another, raised by the plaintiffs' counsel, which lies at the very threshhold of this case.

It is contended by the plaintiffs' counsel, that even admitting that the portion of the goods, which the defendant refused to receive, were damaged by the negligence of the plaintiffs or their agents, still such damage cannot be set off against the freight. In other words, that the plaintiffs are entitled to recover the full amount of freight, and that the defendant must seek his remedy for loss and damage of goods in a separate action to be brought against the plaintiffs.

The plaintiffs' counsel argues on the authority of Lord Ellenborough, in the case of Ritchie vs. Atkinson, (10 East, 295,) and Davidson vs. Gwynne, (12 East, 381,) that the defendant cannot set off loss and damage arising from the negligence of the plaintiffs or their agents, against the claim for full freight, but must first pay their freight and then seek his remedy in another and distinct suit. I confess that the doctrine contended for is sustained by the cases cited, but with all possible respect for the opinion of the eminent judge in those cases, I do not consider it consonant with either reason, justice, or the more modern decisions on that subject. To say that in an action brought by the carrier for freight, the merchant cannot set-off the loss and damage of the goods *arising from the negligence or misfeasance of the carrier*, but must be turned over to another suit, would in many cases be nothing less than an absolute denial of justice, and shocking to all sense of right. In the present case, for instance, the plaintiffs reside in Chile, their vessels have returned, they have no property here, and to force the defendant to a cross action to recover his damages would be a virtual denial to him of all remedy. The demands in this case are not such as arise out of distinct and independent transactions, but grow out of the same transaction, and are intimately related to each other. There is a connection between these demands —a mutuality of indebtedness, which in my opinion clearly entitles them to be settled in the same suit. Upon principle, I have no doubt as to the decision of this question, and I think it is sustained by good authority.

Lord Mansfield, in the case of Green vs. Farmer, (4 Burrows' R. 2220, 2221,) in treating of the subject of set-off, holds the following language : "*Natural Equity* says, that cross demands should compensate each other, by deducting the less sum from the greater, and that the difference is the only sum, which can be justly due. But *positive law*, for the sake of the forms of proceeding and convenience of the trial, has said that each must sue and recover separately, in separate actions. It may give light to this case and the authorities cited, if I trace the law relative to the doing complete justice in the *same* suit, or turning the defendant round to *another* suit, which under various circumstances would be of no avail." He then gives a brief history of the doctrine of set-off, showing his view to be, that where the demands are clearly *connected* and arise out of the same transaction, they are the proper subjects of set-off.

Judge Story in his valuable commentaries on Equity Jurisprudence, vol. 2, § 1434, in treating of this subject, and referring to the decision of Lord Mansfield in the case of Green vs. Farmer, says: " As to

R

connected accounts of debt and credit, it is certain, that both at law and in equity, and without any reference to the statutes, or the tribunal, in which the cause was depending, the same general principle prevailed, that the balance of the accounts only was recoverable, which was therefore, a virtual adjustment and set-off between the parties. But there is reason to doubt, whether Lord Mansfield's statement of the jurisdiction of equity in cases of set-off is to be understood in its general latitude, and without some qualifications. It is true, that equity generally follows the law, as to set-off; but it is with limitations and restrictions. If there is no connection between the demands, then the rule is, as it is at law. But, if there is a connection between the demands, equity acts upon it, and allows a set-off under particular circumstances.

In the case of Hulbert *et al. vs.* the Pacific Insurance Company, 2 Sumner's R. 477, in which Judge Story refused to allow the defendants the right of set-off, the demands were *unconnected* with the plaintiffs' claim, but grew out of separate and distinct transactions. His language maintains the doctrine for which I contend. " However true it may be," says that eminent jurist, " that the right of set-off of mutual demands between the parties is founded in natural justice and equity, (a proposition to which I give my full assent,) it is very certain, that the common law has not carried this right into full effect: for by that law the right of set-off is limited to mutual connected debts, and does not extend to debts which are unconnected with each other. The present case is not one of mutual connected debts." Showing clearly, that if the debts had been connected he would have allowed the set-off.

Courts of admiralty acting upon the general principles of equity will allow set-offs by way of diminishing compensation, when they attach to the particular maritime demand submitted to their cognizance by the libel. " The set-offs," (says Judge Story, in Willard *vs.* Dorr, 3 Mason's R. 171,) " allowed in the admiralty are principally those, in which advances have been made upon the credit of the particular debt or demand, for which the plaintiff sues; or which operate by way of diminished compensation for maritime services on account of imperfect performance, misconduct, or negligence; or as a restitution in value for damages sustained in consequence of gross violations of the contract for such services."

The later decisions in the United States on this point, except in those States where the statute intervenes to prevent, sustain the doctrine of set-off in cases like the present to the fullest extent. These cases will be found referred to in the U. S. Dig. 2 vol. Supp. 758, and in Abbott on Shipping, 5th Am. Ed. by Perkins, 517, Note 1.

In an action brought to recover the amount of freight agreed to be paid for the transportation and delivery of a certain quantity of merchandise from Buffalo to Chicago, evidence, that a portion of the goods agreed to be transported exceeding in value the whole amount of the freight claimed, was through the negligence, carelessness and improper conduct of the plaintiff, lost and destroyed on the voyage, was held to be admissible, as well in the nature of a set-off, as, also, for the purpose of reducing the amount sought to be recovered by the plaintiff. Edwards *vs.* Todd, 1 Scammon, 463.

Again, in the case of the Kaskaskia Bridge Co. *vs.* Shannon, 1

Gilman 15, it was held, that in an action for freight, the defendant may set-off a loss of a portion of the goods, agreed to be transported, by the carelessness and negligence of the carrier.

But it is said these decisions are based upon the practice act of Illinois, which allows such demands to be set-off. Grant this to be true, and yet it does not lessen the weight of those decisions. The principle upon which the statute is based is a correct one.

In Pennsylvania also it has been frequently decided, that in an action brought by a common carrier against the consignee to recover the price of carrying, the defendant may set up as a defence, negligence, or want of skill in the carrier, whereby the goods were deteriorated in value. Leech *vs.* Baldwin, 5 Watts, 446; Humphrey *vs.* Reed, 6 Wharton, 435; Herrison *vs.* Morton, 2 Ashmead, 150.

It being settled then, that the defendant may set-off damages arising from the negligence of the plaintiffs or their agents, let us proceed to consider the next question, namely, what is the nature of the damages in this case. Are they the result of negligence on the part of the carrier, or did they arise from causes for which the plaintiffs are not liable ?

On one side it is said that the injury arose from the ordinary deterioration of the goods in the course of transportation and from the dangers of the seas, and is in nowise attributable to the neglect or misconduct of the plaintiffs. On the other hand it is maintained that the injury was the result of bad stowage, neglect to pump the vessel and other carelessness on the part of the carrier.

A large portion of the damaged goods on board the " Perla," it appears, were injured by what is termed " sweating," which may arise from various causes, such as the confinement, closeness, or newness of the ship, and the nature of the goods conveyed. Where goods become deteriorated in value from any intrinsic principle of decay naturally inherent in the goods themselves, or the sweat of the hold, where there has been proper stowage and no negligence on the part of the carrier, the merchant must bear the loss, as well as pay the freight, for the master and owners of the vessel are in no fault, nor does their contract contain any insurance or warranty against such an event. (Abbott on Shipping, 428 ; Angell on Carriers, § 210.) But the carrier is responsible for the careful stowage of the goods, (unless by usage or agreement this business is to be performed by the shipper,) and is bound so to stow and arrange the different articles, that they may not be injured by each other, or by the motion or leakage of the ship. And where the goods are perishable in their nature, such as fruits, vegetables, &c., the master is bound to take all reasonable care of them, and if they require to be aired or ventilated he must take the usual and proper methods for this purpose. (Abbott on Shipping, pp. 346, 371; Angell on Carriers, § 210, 211, 212; The Schooner Reeside, 2, Sumner, 567.)

From the evidence, it appears that the vessel was furnished with proper dunnage and the goods were well stowed, therefore, I am clearly of the opinion that the damage arising from the " sweating" is one for which the plaintiffs are not responsible. But with reference to the damage of the twenty half bags of flour and twenty-five bags of beans, which were injured with salt water, I am of a different opinion, for the plaintiffs are bound to exculpate themselves from the

charge of negligence in the case of those goods, and have failed to do so.

Of the goods shipped by the "Adele," there were twenty bags of bread missing, and twelve damaged, which the defendant refused to receive. For the twenty bags lost the plaintiffs must pay, and it now remains to determine who must bear the damage of the twelve bags.

This bread was transferred from the "Adele" to the French ship "Nil," at Tahiti, and there is not a particle of evidence submitted to the court to show how it was injured. Indeed, we are left entirely in the dark respecting the bread shipped by the "Adele," further than the facts, that it was shipped in good order, transhipped in Tahiti, and arrived in bad order. We are asked to presume that the damage was not the result of negligence on the part of the carrier, but in the absence of all evidence on the subject, we think the legal and just presumption is the other way. If merchandise in good order is entrusted to a carrier, and it arrives at its destination in a damaged state, the carrier is responsible, unless he can show that the damage is not the result of his negligence. The *onus* is upon the carrier to show how the goods were injured, and not upon the merchant. To impose upon the merchant the obligation to prove negligence on the part of the carrier would be a great hardship, for he does not usually accompany the ship, and is not acquainted with the incidents of the voyage, whereas, on the contrary, it is an easy matter for the master when he has used care and diligence in transporting the property, to show that care, and the absence of any negligence on his part.

In the case of Webb *in re.*, 6 Scott N. R., 956, (cited in Angell on Carriers, § 213, note 2,) which was an action to recover damages for injuries done to a case of looking-glasses shipped on board the defendant's vessel, Judge Oakley said: "The law presumes, that if the goods were safe when put on board, that the injury to them arose from negligence on the part of the defendants, unless they show the contrary." (See also Angell on Carriers, § 212, note 2.)

The next question is, at what rate shall the defendant be compensated for the twenty bags of bread lost, and the twelve injured by the "Adele," and the flour and beans injured by salt water on the "Perla?" Shall it be at the price of bread at Valparaiso, the port of shipment, or at Honolulu, the place of destination? In other words, what is the correct rule by which to measure the damages of the shipper in case of loss or injury to his goods?

Judge Conkling, in his learned Treatise on Admiralty, says, "After considerable research, I have not had the good fortune, extraordinary as it may seem, to find that any definite rule has been definitely established with respect to the measure, by which the damages of the shipper, in case of loss or injury to his goods, are to be estimated." But he evidently inclines to the opinion, reasoning by analogy from the rule in cases of prize and insurance, that the measure of damages should be the value of the goods at the time and place of shipment, in case of loss, and in case of damage, the diminution of value by reason of injury, estimated by the same standard. I think, however, that upon principle, the measure of damages, should be the value of the goods at the place of destination, and I believe the weight of authority and late decisions will be found to accord with this view. "All the ordinances and authorities," say the court, in the case of

Wilkinson *vs.* Laughton, 8 Johnson's R., 213, " declare this to be the rule, when the goods are sold by the master from necessity, in the course of the voyage; and why should not the same rule apply, when the goods are missing by other means ?" In case of loss the damage to the plaintiff, by the non-delivery of his goods, it strikes me, is the net price which the goods would have brought, at the place of destination, and upon principle I cannot see how any other view can well be adopted. If the goods should be of increased value, at the place of delivery, as they generally are, and the liability of the carrier extends no further than the value at the place of shipment, there is very great temptation to fraud, and public policy requires, that a carrier should be removed from all temptation to convert the goods to his own use. For a more able exposition of these views, and a history of the cases bearing on this point, I would refer to Flanders on Maritime Law, § 211, note 4. In a late Treatise on this subject the measure of damages in actions against common carriers, is stated to be, the value of goods at the place of destination. (Sedgwick's Measure of Damages, p. 170.)

The whole amount of freight less that for the 20 bags of missing bread, amounts to $1,724 16, and from this we must deduct the value of the 20 bags of bread lost, at its price in Honolulu, (less freight, duties, and charges,) which we estimate at $140. There must also be deducted the damage to the twelve bags of bread injured by the " Adele," and the twenty half bags of flour and twenty-three bags of beans injured by salt water in the " Perla," all of which I estimate at $170 50. This will leave a balance of $1,413 66, the correct amount of freight due the plaintiffs. From this balance we should deduct the sum of $604 44 now in the hands of, and received by, the plaintiffs for damaged goods sold for the benefit of whom it might concern, which leaves the sum of $809 22.

My judgment accordingly is, that the defendant shall pay to the plaintiffs the sum of $809 22, and that the costs of court shall be divided equally between both parties.

Mr. Blair, proctor for plaintiffs.

Mr. Bates, proctor for defendant.

---

## MOTION FOR A NEW TRIAL.—OCTOBER 24, 1854.