Thompson, J.,
delivered the opinion of the court. Several of the questions raised in this cause have already been disposed of in the preceding case, against the same defendant, upon the cargo of the same vessel. The circumstances relative to the blockade of Cadiz, and the detention in consequence of the fever that broke out at Cadiz, shortly after the arrival of the vessel there, are necessarily the same. It having been decided that Cadiz could not be considered a blockaded port, there could be no objection against this vessel’s putting in there, pursuant to the permission given in the policy. It is manifest, from' the whole current of the testimony, that there existed a pretty strong necessity to put into Cadiz for the purpose of repairs, and that this was the sole object, and not for the purpose of trade. The captain appears to have acted with as much de-spatch in procuring the repairs *to be made, as the state of things at Cadiz would warrant, to have been anxious to pursue the voyage to Algiers, and did everything in his power to accomplish it, until misfortune after misfortune had so increased his expenses that he found it impossible, from the want of funds, to proceed. Thus far the facts in these cases are the same as in the case on the cargo.
But in the case on the ship it appears that, before and after the time the plaintiff purchased her, she was under a bottomry bond for upwards of 6,000 dollars, given by Cas-simir Delavigne, the former owner, of which the plaintiff was wholly ignorant. That while she lay at Cadiz, after «ill her repairs were made, though not until the plaintiff *19 found that it was no longer in his power to proceed on the voyage to Algiers for want of funds, and had determined to abandon it, proceedings were instituted against the vessel under this bond, in consequence of which she was seized and sold by order of the Royal Consulado at public auction for 88,500 reals vellón, (about 1,925 dollars,) which sum, after deducting the charges, was paid to the holder ol the bottomry. A question then arises here, whether the plaintiff had an insurable interest in this vessel, she being under a bottomry bond to more than the amount of her value in the policy. The assured had, we think, an insurable interest in the subject. He, having possession and the right of redemption, must be considered the owner for the purpose of insurance.
The hypothecation does not transfer the property of the ship, but only gives the creditor a privilege or claim upon it to be carried into effect by legal process. Abbott, 117.(a) The owner of a ship who has mortgaged her, and who is also master of her, cannot, while he is possessed of the equity of redemption, commit barratry; because he is still considered as the owner, notwithstanding the mortgage, and so cannot commit a fraud against himself. Lewin v. Suaso, in chancery, Marsh. 452. The doctrine, that the person having the possession and holding the equity of redemption, has an insurable interest, is strengthened by the decision of this court in January term, 1801, in the case of Robertson, that the person holding the bottomry *bond has not an insurable interest, without there is a special clause inserted in the policy, designating the particular interest insured. There is nothing, we think, in the conduct of the plaintiflj showing want of good faith; *20 all the witnesses concur in representing that he was extremely solicitous to pursue the voyage to Algiers, but that he was obliged to abandon it for want of funds. This was on the argument admitted by the defendants counsel to be, as a general principle, sufficient cause for abandonment, and breaking up the voyage. We see nothing in this case to take it out of the general rule. The difficulty and embarrassment which the plaintiff met with in raising funds, were not occasioned by the bottomry bond. No claim was made on this vessel by virtue of that bond, until after the captain had determined to abandon the voyage. The next question, then, will be as to the amount of the loss of the ship. The underwriter, ■ we think, clearly ought not to suffer in consequence of the encumbrance on the ship by the bottomry bond ; this is a loss that must be sustained by the plaintiff; or, for which he must look to the - person from whom he purchased the vessel.
In ordinary cases, immediately on the abandonment, the subject insured would become the property of the underwriter, and he would be entitled to receive its full value. If, then, the underwriter has been deprived of this property in consequence of a lien or encumbrance for which he is not answerable, the assured must put him in the same situation he would have been in, had no such lien existed; that is, in the present case, by deducting the value of the vessel at the time of abandonment, from the amount of the insurance. And we know of no better rule by which to ascertain that value, than by the sale, provided there was no fraud or collusion. Had not the ship been seized under this' bottomry bond, the captain would have been obliged to sell her, as the voyage must have been broken up ;■ the sale would have been at the same place, and under equally unfavorable circumstances. We can discover no fraud or unfair conduct in the transaction. She was sold at public auction under the direction of a public officer, and we think the price for which she was sold, must, prima fade, be considered her true value, and *this being less *21 than one half her true value, there was, of .course, a total loss. We are therefore of opinion the verdict was against the evidence, and that a new trial be granted on payment of costs. With respect to the case on the freight, we are satisfied with the verdict of the jury, that there was a pro rata freight earned, to wit, four fifths of the whole, imounting to 2,400 dollars. The owner of the vessel was also master, and pan owner of the goods. We take it to be a rule well settled, that where a ship by reason of any disaster, goes into a port shore of the place of destination, and is unable to prosecute and complete the voyage, and the goods are there received by the owner, freight must be paid according to the proportion of the voyage performed. This rule is certainly founded in justice and equity, and ought to receive a liberal application. The master here, acting in the double capacity of captain of the vessel and owner of the cargo, interfered, and disposed of the goods, and although, perhaps, it may be difficult to say whether in such a disposition he acted in his capacity of owner or master, yet, we think, prima facie, he ought to be considered as acting in that capacity which leads to the most equitable result, and best answers the end of justice.
The circumstances under which the cargo was received and disposed of by the plaintiff, were submitted to the jury, who, by their decision, must have considered him in that transaction, as acting in his capacity of owner; and in doubtful cases where the justice of the case is with the verdict, we think the court ought not to interfere and set it aside. The opinion of the court, therefore, is, that the plaintiff take nothing by his motion.
Livingston, J.
Judgment was given in favor of the plaintiff- on two other policies on this voyage; the one on ship, and the other on cargo. I concur in all the points determined, except as to the effect of the bottomry on the insurance, and in conclusion that the voyage was finally defeated from a want of funds. Here, also, I agree in the opinion just delivered, that a pro rata freight was earned as far as Cadiz, and that if the plaintiff be entitled to recover at all, the verdict is right; but I cannot think the defendants are liable for any thing on this policy.
*It is essential to the validity of every contract of this kind, that an account be given to the underwriters of every mateial fact, which enhances the risk. This account, in other words, should be exact and complete, because the insurer computes his risk by it. If, therefore, any circumstrance be suppressed or concealed, which the insured knows to exist; and which, if disclosed, would entitle the other party to demand a higher prenium, the contract is void; for every intentional concealment of circumstances which vary the risk, is regarded as a fraud. But it is not only a fraudulent concealment or misrepresentation that will vacate a policy. If a representation be mabe from oversight, or with the utmost good faith, and without any design to impose, still, if it be of a material fact, and not true, there is an end to the policy. There is no reason why the same rule should not apply to an unintentional concealment; nor ought it to form any excuse that the assured knew nothing of the fact concealed. He is supposed and ought to know every thing material that relates to the subject of insurance, and is presumed to be in a situation to lay before the underwriters every matter necessary to form a just estimate of the risk he is about to assume. The property is his, and by a moderate degree of attention he might obtain every necessary information respecting it. If he does not, he must be deemed guilty of. negligence, for which he alone ought to suffer. If neither of the parties know of a circumstance which subsequent events have discovered to be important, the contract is founded in mutual error, in which case the parties cannot be said to have assented to it. If the assured had known the circumstances, he would not have effected an insurance at all; or would have disclosed it to the underwriters, who would have declined the risk altogether, or *22 have asked an increase of premium. These principles accord with those which are laid down and illustrated by Mr. Millar, in his Law of insurance. “ Every instance of misrepresentation and concealment,” says this learned author, “ however unintentional, if it varies the risk under-talcen, in the minutes particular, from that understood, destroys the consent of parties, and annuls the contract.” “It implies not only mistake, *butmistake founded in fault.” “ Guipa lata," say “ equibartur dolo." Page 49.
It remains to show the application of these principles to the present case I am now considering. "Whether, in virtue of the abandoment at Cadiz, the plaintiffs be entitled to call on the defendants for payment of their subscription to the policy, inasmuch as she was, within ten days thereafter, and before the defendant could by any possibility have heard of the abandonment, seized to satisfy a bot-tomry bill of which they knew nothing ?
The insured, before an indemnity can be demanded of an underwriter for a technical total loss, must abanden or cede to him all the property that may be recovered from shipwreck, or any other peril enumerated in the policy. In virtue of this abandonment, the underwriter is entitled to the property saved, and to dispose of it as he may think proper. But if the property thus ceded be withheld from any other cause than from one of the perils insured against; or if he cannot obtain possession for any other reason than on account of such peril, he ought not to be held to pay for the loss. It is certainly part of the contract, that in case of abandonment, the assurer shall have the property saved so far as his insurance extends; and if this right be defeated by any act of the assured, or by any circumstance not within the perils insured against, and not known to the underwriter, he cannot, without manifest injustice, be chargeable. In this case the property was kept from the defendants, and the object of the abandonment thus defeated, not by any accident within the policy, *23 but by enforcing a mortgage which existed long before tho insurance was effected. It cannot be pretended that the defendants assumed this risk, nor that they would, but for a very large premium, have exposed themselves to it. It is not enough that the plaintiff is willing to credit them with the proceeds of the sale under the sentence of the Spanish tribunal, which -were applied to extinguish the bond. It is the saie itself of which they complain. No one can say that a compulsory disposition, in a foreign port, of any American vessel, and that for cash, will fur' nish a fair criterion of her real value; nor is it probable that the defendants, is left at liberty, as they ought to have been, would have sold her *in a way, which could not but be attended with great sacrifice. They would probably have ordered her to this country, or pursued other measures to mate the most of the property. This reasoning may at first appear more applicable to an insurance on the' vessel, but I have not thought it necssary to make any distinction ; for, on the principles on which I proceed, if the voyage were impeded, or finally defeated, by occasion of the bottomry; the underwriters on freight ought to be more liable than those on the ship. But it is alleged, that it being determined to abandon the voyage previous to any proceeding on the bottomry, and the underwriters being fixed by such abandonment, it is of no importance what became .of the property afterwards. Without examining the effect of an abandonment of a voyage, thus declared abroad before a consul, and without any communication of it until long after to the underwriters, I think it has been already shown that even if the abandonment were good, yet if its object, as it regarded the defendants, were defeated by judicial process not grounded on any marine peril, there ought to be no recovery. The want of funds, I am satisfied, was a mere pretence to break up the voyage, before a seizure took place under the bottomry. It is incredible that in such a city as Cadiz, between which and New York there is a *24 constant commercial intercourse, it should not be practicable to raise funds necessary to repair the Prosper; but if such difficulty existed, it may fairly be imputed to the owner’s inability to give an adequate security on the vessel in consequence of the antecedent hypothecation, and this furnishes another reason for not rendering the underwriters liable. But for this obstacle, no doubt, money would have been raised. My own belief is, and it is warranted by the whole course of the transaction, that no idea was entertained of abandoning the voyage to Algiers until after Williams discovered that the bottomry bill was in Cadiz; and that to avoid an arrest on that account, he contrived to put a period to the voyage, pretending that no funds were to be had to pay for or finish the repairs. How could this be possible? Mr. Terry, the American Consul, had already paid for all the repairs which had been put on previously to her being blown to sea; and it is very evident that when she was thus forced out of *the bay of Cadiz, she was preparing to go to A1 giers. The injury she sustained at this time was too trifling to cause any delay, and the repairs of the former injuries being paid, I regard as wholly fictitious the difficulty about funds. I neither believe it real, nor that it had any influence in terminating the voyage. My opinion therefore is, that a new trial be granted, not, however, because the damages are too small, but because the plaintiff is not entitled to recover any thing.
In the action on the ship new trial granted.
In that on the freight refused.

 Quern, whether some distinction is not to be taken between eases on bottomry bonds and those on bottomry bills ? In the first, the vessel is mortgaged and assigned to the lender; in tho latter, she is bound to the payment. And liere again a difference may arise between cases in England and cases here, on account of the wordings of the register acts of the two eountries.