## Case No. 17,453.

### WESTON et al. v. MINOT et al.

[3 Woodb. & M. 437;[1] 10 Law Rep. 305.]

Circuit Court, D. Massachusetts. Sept., 1847.

CHARTER PARTY—DEPTH OF LADING—AUTHORITY OF MASTER—DISPUTE WITH CHARTERERS — SURVEY—APPORTIONMENT OF FREIGHT—EXPENSE OF TOWAGE.

1. Where a vessel is chartered to another for a voyage to Calcutta and back, to carry all lawful goods placed on board, and for a gross sum for freight out and back, to the entire capacity of the vessel, it must be considered to mean all goods not contraband nor diseased, and as many of them as can be put on board without making the vessel draw too much for safety.

[Cited in Boyd v. Moses, 7 Wall. (74 U. S.) 319.]

2. If the goods put on board are heavy articles, and before the ship is full sink her as low as is usual and proper without extra danger, the owners or master of the vessel may refuse to take more without violating the charter party.

[Cited in Boyd v. Moses, 7 Wall. (74 U. S.) 319; The Giles Loring, 48 Fed. 469.]

3. The test of safety is the depth the vessel was built to draw, the depth her officers in several years' experience had found to be sufficient, the depth those of experience on the spot, after careful examination, reported to be proper, and the depth which several other vessels at the same time and place loaded to, considering their comparative tonnage.

4. If the vessel took on board in weight nearly double her measured tonnage, and was in good repair and well manned, she was not a defective or imperfect vessel, though she would not bear filling up entirely with a cargo, most of which consisted of such heavy articles as saltpetre and linseed.

5. Freight contracted for in gross for a voyage out and in, cannot be apportioned and recovered for a part of the cargo, or a part of the voyage, unless, from some expression in the contract, or nature of the voyage, or act of the hirer of the vessel, or measure of the government, an apportionment becomes feasible and just.

[Cited in Perkins v. Currier, Case No. 10,-985.]

6. A survey of the vessel by other sea captains, who reported and swear to the truth of the result, is not conclusive as to her proper depth, but is a sound measure of precaution in a dispute between the master and the charterers.

7. The inclination of courts should be to sustain what seems prudent and watchful over life and property in such cases by a master, if it be done openly, after full notice to the other party, and under circumstances not indicating either groundless timidity or selfishness.

[Cited in Jelison v. Lee, Case No. 7,256.]

8. Where goods are landed at the wrong place by a master, and then reloaded, the expense must be borne by him or the owners; but if, during his illness, they are so landed by the mate, and at the request of the supercargo, the agent of the charterers, the latter must pay the expense.

9. If the charterers were to pay the expense of steam to tow the vessel to sea, if drawing over seventeen feet of water, and if they or-dered the use of steam, they were not held liable when the vessel drew over eighteen feet and used steam, if giving no such order by words or letters, and if vessels after went down and to sea without steam, though drawing over seventeen feet.

This was a libel transferred from the district court without any decree there, as the judge was related to one of the parties. It alleged that the libelants [G. B. Weston and others] were owners of the ship Mattakeeset, and in August, 1843, chartered her to the respondents for a voyage from Boston to Madras and Calcutta, and back to Boston. That the plaintiffs were to keep the vessel in good condition, and take on board such goods as the respondents offered, to her entire capacity. That she did take a full cargo of ice at Boston, with certain other articles, and delivered them safely to the agents of the respondents at Madras, and brought back for them to Boston safely another cargo of saltpetre, linseed, &c., and they were entitled by the charter to receive therefor the sum of $13,000, in five days after her return, with charges and pilotage in foreign ports. That as the vessel drew over seventeen feet, the expense of taking her down the river from Calcutta by steam was properly incurred and chargeable to the respondents [G. R. Minot and others], which, with the other charges and freight, amounted to $13,856. It alleged that this, though demanded, had not been paid, and asked judgment for the amount. The answer admitted the charter party, and the amount to be paid therefor, if allowed to use the whole room of the vessel, and admitted, also, the liability to pay the expenses in foreign ports, not exceeding one hundred rupees. But it denied that the respondents were liable for the cost of towing the vessel to sea by steam, and it further denied that the vessel received at Calcutta such goods as they offered to put on board, or enough to fill her up, but left vacant forty or fifty tons weight, and a large space within decks, sufficient to cover $1,920 worth of freight from Madras to Boston. The answer also claimed a forfeiture of all freight by means of this refusal to let the vessel be filled up. It denied, also, $28.99 for damages to some domestic cottons on board, caused by neglect in stowing them, and $45.49 more for expense incurred in landing improperly one hundred and twenty-eight bales of cloth at Madras, which were shipped for Calcutta, and not Madras, $414 more for damage on the return cargo, and $40.42 for articles missing. It further alleged that $2,020.07 had been advanced to the libelants in India on account of freight. The charter party was given in evidence dated August 15th, 1843. It was in substance as set out in the libel, including the usual printed clause in the forms, to receive on board "all such lawful goods and merchandise" as the charterers "think proper to ship," and after the agreement to

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

pay $13,000 for freight, a written clause was added, "in full for the entire capacity of the ship out and home." The provision in the charter party as to pilotage, was not to pay for the use of steam up and down the river, unless ordered by the respondents. Much evidence was put in as to the fact, whether the vessel was loaded homewards as full as was safe, and as to the actual depth of water she drew out and back, how near her decks were to the water's edge, how much of her was not filled up, the propriety of towing her to sea by steam, the size and form of the vessel, the damages done the cargo, the negligent landing of some goods at Madras, and various other matters bearing on the points in controversy. On some of these topics the testimony was contradictory, and on others, uniform. So much of it as may be useful to state will be given in the opinion of the court.

E. D. Sohier and Charles P. Curtis, for libelants.

W. Minot and F. C. Loring, for respondents.

WOODBURY, Circuit Justice. It may be well in the outset to separate the points in case which are not now in controversy from those which are, and, among those which are, to dispose of such first, as are least difficult and least important. The plaintiffs are now willing to allow the $28.99 for damages on the cloths, the $414.01 for damages on the home cargo, the $40.42 for articles missing, and $2,007.20 for money advanced to them abroad towards freight. The evidence and law in relation to these need not, therefore, be examined. The claims left and still contested, are the $45.49 for expenses by the respondents in reloading certain articles at Madras, which should not have been put ashore there, and the two claims made by the libelants for a steamboat to tow the vessel to sea, and for the general balance for the freight and charges in foreign ports, after deducting the expenses and advances by the libelees. In respect to the first matter in controversy, it is true that the master of the vessel should not, of his own accord, have landed articles at Madras, which, by the papers on board, were to be delivered at Calcutta. But in relation to this, it appeared in evidence that the master was then indisposed, and these articles were put on shore at Madras, by the mate, under the request of the supercargo of the respondents. As the official cause of the mistake was a request from the supercargo, the agent of the respondents, and the delivery was made in the master's necessary absence, it would be inequitable to consider a compliance with this request by the mate as such a neglect as ought to relieve the respondents from the expense of the wrong of their own agent. They should not devolve it on the plaintiffs, whose subordinate officer did nothing but attempt to oblige the respondents and those in charge of their concerns.

In regard to the claims by the plaintiffs:

The first one, for payment for the use of steam, I think must be disallowed. It was beforehand expressly provided in the charter that no payment should be made by the respondents for such steam, unless it was directed by themselves. Thus, "if steam is used up and down the river, it is at the owner's expense, unless ordered by the charterers." There is no pretence here that they gave any such direction verbally or in writing, but only that it was virtually given by their acts in loading the vessel at Calcutta so deep as to draw eighteen feet and a half on an even keel, where the regulations of the port did not require a pilot to take a vessel to sea without steam, if she drew over seventeen feet. One may become liable by his acts different from his words. 10 N. H. 538. But it was proved as a farther fact, that pilots might, if they pleased, take vessels to sea without steam, though drawing over seventeen feet; that this was frequently done, and that most of the vessels in the Calcutta trade, with full cargoes, went to sea drawing over seventeen feet. Under these circumstances, presumed to be known to both parties, it cannot be inferred that the respondents, by loading the vessel so as to draw over seventeen feet, meant to request the use of steam and thus become liable for it. It was not an unusual depth, not one always accompanied by steam, and not one where steam was indispensable. Being then not ordered by words or acts of the respondents, the expenses of it must, under the provision of the charter party, looking either to a strict or liberal construction, be considered as incurred on the responsibility of the owners of the vessel rather than the charterers.

The next, which is the last and most important question, is the liability of the defendants to pay the sum for freight stipulated in the charter. This question becomes one of more interest here, as the defendants contend that they are not answerable pro rata for the full freight out, and for that home, after deducting the space or number of tons left vacant, but are exonerated entirely from the whole, because something short of the whole was not filled up when requested by them. Their reasons assigned for this apparent strictness, are, that the contract of affreightment for the voyage out and back was one, or a single contract, and cannot be apportioned, the contract having been for all the ship, her "entire capacity," and not a portion of it. They contend further, that in case of freight, usually the whole engaged to be delivered is to be delivered as a condition precedent to receive freight, and the failure, even by perils of the sea, to carry safely all, is a loss or forfeiture of freight for all when the price payable was a single or gross sum, and not so much per pound, barrel or ton.

In support of this, see 3 Kent, Comm. 227; 2 Holt, Shipp. 145; 10 East, 295; 7 Durn. & E. [Term R.] 381; 2 Lev. 124; Abb. Shipp. 246. By some cases nothing is considered due for carrying a part of the whole which was stipulated. [Caze v. Baltimore Ins. Co.] 7 Cranch [11 U. S.] 358; 2 Mass. 147; The Nathaniel Hooper [Case No. 10.032]; 2 Johns. 356; 1 Johns. 24; 15 Johns. 332. Carrying the whole, and for the whole voyage, is regarded often as a condition precedent. 1 Bulst. 167; 8 East. 457: 2 Barn. & Ald. 17; [6 Whart. 442.] [2] It may be such a condition, if, in its nature, it precedes what is to be done, or is the root of it. Abb. Shipp. 253, 266; 12 East. 381; 10 East. 555; 3 Bing. N. C. 355; 21 Pick. 438. While, on the contrary, the plaintiffs insist that where an apportionment in such cases is feasible, it is equitable to make it, and that a court of admiralty is to be governed by equitable rather than strict common law principles. Brown v. Lull [Cas. No. 2.018]: Dean v. Bates [Id. 3,704]. Indeed, Spence on Equity Jurisprudence (page 17) says that admiralty powers were once exercised in the courts of chancery. It is further insisted here, that the full freight out can be assessed on the ratio it bears to a full freight home, if considering the former as less valuable in voyages of this kind. And that the freight home can be apportioned for the quantity filled up, compared with the whole. or with such as ought to have been filled up. This last course certainly seems the more just, and is less penal and technical. Compensation is to be made, rather than a forfeiture, if it can be legally. 2 Story, Eq. Jur. §§ 1313–1316. This, at the same time, would allow a recovery by the respondents, or a deduction for any peculiar damage they may have sustained for not being allowed to send in this vessel. or so soon, or on so good terms, the quantity of merchandise not taken, which ought to have been taken. Abb. Shipp. 253, 270, 480, note; 6 Munf. 34; 10 East. 530: 1 Camp. 377: Poth. Chart. Parties. 25; 2 Holt, Shipp. 37; 8 Taunt. 516. This would seem peculiarly proper, as the rule, rather than a forfeiture of the whole freight for a very small omission, or departure from the contract to carry all the vessel could. And this departure happening, not from willfulness, caprice, neglect or malice, but a mere error of judgment, or mistake in fact, yet candor compels me to say that the cases in point which support this last view are those, however plausible in appearance may be some of the appeals in it to equitable considerations.

Perhaps if the contract be indivisible in terms, and the parties make no express exceptions, the true rule will be found to be. that the voyage must be treated as a whole. and the cargo as a whole. and no freight be recoverable, if not all. with only such exceptions as will soon be enumerated. Abb.

Shipp. 406, 455, note; 3 Johns. 335; 1 Dod. 317; [Columbian Ins. Co. v. Catlett] 12 Wheat. [25 U. S.] 383; Sampayo v. Salter [Case No. 12,277]; 3 Greenl. 1; 5 Mass. 252. An attempt in parliament by statute to exempt owners from liability for goods, &c., unless injured or lost by default of owners, officers and crew. has been made but failed. Abb. Shipp. 383. It is truly said that generally the parties are competent to make their own contracts. and if not choosing to insert proper limitations and restrictions adapted to ordinary events, should not complain if they are required to abide by the consequences of their own neglect. But, on the contrary, if relief can be extended without violating the spirit or equity of the contract, it certainly should be, and so if the case come within any of the exceptions just referred to. Thus if the vessel is prevented by a blockade from completing her voyage, still the owners may recover freight. The Friends, 1 Edw. Adm. 246. Or if that cargo be lost by leakage, decay naturally, &c. 2 Johns. 327. Or if it be sold by the shippers or accepted short of completing the voyage. See former cases. Hurtin v. Union Ins. Co. [Case No. 6,942]; 4 N. H. 261; 2 Conn. 394. Or if there be a refusal to permit its landing by government. [Morgan v. Ins. Co. of North America] 4 Dall. [4 U. S.] 455; 3 Kent, Comm. 222. So if it be not full freight, or if it be not delivered by default of the shipper, freight may be recovered. Abb. Shipp. 406, note; Jordon v. Warren Ins. Co. [Case No. 7,524]; Bork v. Norton [Id. 1,659]; The Nathaniel Hooper [supra]; 3 Kent, Comm. 228; 11 Mass. 229; 16 Johns. 346. Or if it be properly thrown overboard in a storm. 1 Speers, 321; 2 Johns. 327. Some cases hold, as between owners and shippers, if parts of the cargo are lost at sea, the owners of the ship may recover freight for them pro rata itineris. 4 Mass. 221; 5 Mass. 225; Park, Ins. p. 70. c. 2; Abb. Shipp. 443, 455, in notes. This is perhaps, if the rest reaches the shipper's hands, or is accepted. 1 Johns. Cas. 377; 2 Johns. Cas. 443; 2 Caines, 13; 2 Johns. 323; 9 Johns. 186; 1 Johns. 24; [Caze v. Baltimore Ins. Co.] 7 Cranch [11 U. S.] 358; 6 Cow. 504; 3 Pick. 20. Some cases also allow a recovery in a proper action quantum meruit, though not able to sound on the special terms of the charter. Abb. Shipp. 457; Bing. N. C. 555. But it is not necessary to go into this further and settle this point definitely here. as, in my view, under all the facts and circumstances of the case, the plaintiffs appear to have substantially fulfilled the charter party.

So another question might arise, not mooted, and hence not decided. whether a party can recover back what has been advanced in a case like this. if the contract has not all been fulfilled. On this, see Abb. Shipp. 408; 3 Pick. 20; 3 Johns. 335. But believing it was fulfilled, I hasten to see what was mainly required by the terms of the contract, and then to show that those requirements were complied with sub-

---

[2] [From 10 Law Rep. 305.]

stantially. That part of the contract stipulating to receive all such lawful goods as the defendant should offer to put on board, is an ordinary one in the printed forms, and, in my view, refers to the kind, rather than the amount, of goods—to their quality, and not quantity. If lawful or not contraband, (Abb. Shipp., last Ed., 347,) nor diseased, they were to be received, whether heavy or light, bulky or compact, agreeable or disagreeable, and this must be the only reasonable signification applicable to that provision. If it meant otherwise and subjected the owners to receive any quantity of goods, however heavy, which the shippers might choose to offer, the vessel might be so overloaded with heavy articles as to sink at her anchorage before full, or go down in the first gale, and she might, when not insured, be an irremediable loss to the owners, while the charterers might risk and escape suffering by a high insurance on their goods. And otherwise the absurdity would be involved in the stipulation, that both parties had agreed to the insertion of a clause, and that an ordinary one, with a meaning attached to it, open and likely to produce at times a total loss of both vessel and cargo. This shows, also, the proper signification and limitation belonging to the other provision, paying freight for the "entire capacity" of the vessel. That, of course, means her entire capacity without danger to her safety. This construction, in case of light goods, might fill her entirely, without such danger and without making her too deep, whereas, in case of very compact and heavy goods, if filled entirely, she might be so deep as probably to sink in the first gale or strong swell. We must start, then, with the construction of this charter, which is reasonable and proper, holding that the owners could not reject any goods offered, on account of their character, if not contraband or diseased, but were not obliged to take a greater quantity on board than the vessel, looking to her tonnage, shape and draught, could carry in safety. Hunter v. Fry, 2 Barn. & Ald. 421. The place and season where and when the voyage was to be performed, the ordinary depth of loading vessels of that size and character, when employed in that business, are some elements to be considered in forming a correct judgment what a vessel can carry safely. These help to indicate what both parties probably meant, and certainly what they ought to have meant, in using such language. The usual forms of charter parties, in some places, provide, likewise, expressly, that the vessel shall be required to receive no more than she can safely carry. See Appendix to Lawes on Charter Parties; Woolr. Com. Law, 98, 99. But this, I think, is only what the law itself should imply as reasonable, when nothing is expressed on the subject.

On this construction of the charter, then, how are the facts? The vessel, it is conceded in all the evidence, was of about four hundred and eighty tons burthen; in shape of kettle bottom; well built; about thirteen years old; marked on her rudder no higher than eighteen feet draught by the builder; and he testifying that she was designed for no more than that draught,

when loaded. She was constructed with a view, more particularly to the cotton trade, and when full of bales of cotton drew only about fifteen feet. Her character and capacity were open to be known to the respondents before hiring her, as she was built at East Boston or Medford, had been in business seven or eight years, and was lying in the port of Boston, where the respondents reside, when the charter party was entered into. It did not appear, from any evidence, that she was out of repair, or had any secret defect, or was in any way incompetent to perform what any one had a right to expect from her size and shape, or what vessels of her tonnage and form can and do usually perform. There was no failure, then, in this respect, on the part of the plaintiffs or their vessel, as has been argued by the respondents. Nor is it understood that the plaintiffs claim any exemption or excuse on that, or similar ground, from carrying all the merchandise which it was proper to put on board of her. Defects in the ship which lead to taking in less merchandise than is usual, might sometimes defeat the recovery for freight. Abb. Shipp. 340, 341; 3 Kent, Comm. 205; 5 East, 428; 3 Mass. 481; 10 Johns. 1; Silva v. Low, 1 Johns. Cas. 184. Nor is there any evidence here of fraudulent representation by the owners as to the capacity and powers of the vessel, and which, if proved, might be fatal to this libel. Johnson v. Miln, 14 Wend. 195.

On these facts, then, the quantity proper for her to take on board was manifestly all she could hold, if it did not sink her below her usual and proper and safe depth in the water. But when her freight on board did sink her to that depth, then it was her right to refuse more. Then the point of safety and duty under the charter was reached, and then the plaintiffs could, if they pleased, pause and decline any increased risk from increased depth, and consequently increased exposure to danger in swells of the sea and gales. It is optional with the owners of the vessel to go further or not, but no right exists in the charterers to require a risk and exposure beyond that. It further appears that on her voyage out, commencing in September, though some of the witnesses think her draught, loaded with ice, was, when starting, nineteen feet, others swear it did not exceed eighteen feet forward, and eighteen feet ten inches aft, and all agree that by the use of water and provisions, and the melting of the ice, it was well known to be likely to become, and did soon become, lighter, and by the end of the voyage she was nearly two feet less in draught. The owners, on learning from the pilot that her draught out at starting was considered by him nineteen feet, wrote at once to the captain, that if it had been so, it was too much, and he must not load back so as to draw over eighteen or eighteen and a half. Sending their letter to England and then to India by overland mail, it reached Calcutta before the vessel, and the captain immediately upon his arrival at Calcutta obtained it and informed the agents of the respondents accordingly, as to the depth he could take in. It therefore became the duty of those agents to select and put on

board a cargo which should draw no more, if that was the safe maximum draught of the vessel. They were bound to see to this, whether at such a depth the whole inside of the vessel should become full or not, and it was their business, if they wished to fill up the whole space, as they might with a larger proportion of light articles, without drawing over that depth, to send on board from time to time such an assortment as would accomplish this object. But they put on board, first a large quantity of one of the heaviest articles in commerce, viz. three hundred and eighty-seven tons `of saltpetre, then a large quantity of linseed, another heavy article, being three hundred and thirteen tons more, and while in the progress of doing this, they were cautioned by the captain that the vessel would reach her proper depth before being full, if more light articles were not substituted. But nothing of this last character was put in, unless forty or fifty tons of goat-skin may be so considered. The blame, then, in not making a change, and in not filling the vessel before reaching a suitable depth, rests on the charterers and their agents, provided the vessel had reached that depth when the captain refused to take more. Major v. White, 7 Car. & P. 41; 3 Conn. 9. The captain neither bought the articles, nor sent them on board, but merely received and stowed such as came. By the charter he was to receive them at the vessel, and his duty begins with the receipt of them, and not before. Abb. Shipp. 346; Moll. de J. Mar. p. 231, bk. 2, c. 2, § 2. He therefore executed his whole duty, in this respect, in first notifying them expressly of the depth to which the vessel might be safely loaded, and in afterwards informing them that such quantities of heavy articles as were coming on board would load her deep enough before filling her. If this mode of stowing or distributing the cargo, putting too much dead weight below, was more dangerous and made the vessel labor more, it arose from the course pursued by the agents in sending the articles on board; and bad stowage in this or other respects, about which there is some testimony, did not affect the real draught with the same articles, and thus have any influence on the question now under consideration. Bad stowage only affects responsibility for injuries or damage to the cargo caused by it. Abb. Shipp. 345, and cases in note; The Paragon [Case No. 10,708]; The Rebecca [Id. 11,619]; The Reeside [Id. 11,657]; 22 Pick. 108.

The only remaining question then is, whether the depth to which he allowed her to be loaded, viz. eighteen feet, three inches in salt water, on an even keel, or when trimmed six inches deeper aft, as was her proper trim, eighteen and a half feet there, and eighteen feet forward, or making a foot's difference, as some testified, nineteen feet aft at Calcutta, and eighteen feet forward, both less by three inches when in blue water, whether this depth was all which the charterers had a right to claim, and beyond which the owners had a right to refuse to go. The space left unfilled, it is agreed, was about one hundred and thirty tons measurement, and which the agents had prepared to fill with gunny

bags, weighing from fifty to sixty tons dead weight, and which would have increased the depth of the vessel four or five inches and which the captain declined to receive. The question is not whether she might not have taken in more, and might not have escaped loss with it. Many vessels so escape with large chances against them. But the question is whether the captain or owners were bound to take more, whether that was not the proper depth under all the circumstances to stop at, if they pleased, and whether their contract or any general principles obliged them to risk any depth beyond that.

Now on the side of the plaintiffs, to show that this was as much as her proper depth, there is, not only the oath of her builder that she was designed to draw only eighteen feet, and of her officers in former voyages, that she had not on any occasion been loaded so deep as that, and the testimony of some, that, when starting out in this voyage, she drew no more, and of all, that she drew less soon on her voyage, and that her owners, when hearing that she drew more, wrote at once it was too much, and must be corrected in her return, but there is much other testimony which remains to be specified. Most of her officers in former years testify that this draught of eighteen and a half feet even keel was as much as should be considered safe. Several other experienced ship masters agree with them in opinion. Several testify that such a depth is sufficient for such a class of vessels. Three American vessels then lying at Calcutta, and, of course, bound homeward with Calcutta cargoes, were actually loaded so as to draw little or no more depth than the Mattakeeset, compared with their different sizes. Thus the Carthage, Captain Archer, four hundred and twenty-six tons, had a draught of seventeen feet, eight inches when loaded. The Argo, Captain Crowninshield, of four hundred and forty-nine tons, had a draught of eighteen feet, three and a half inches. The Plymouth, Captain Fuller, of four hundred and twenty-five tons, had a draught of seventeen feet, six inches; and the Mattakeeset, Captain Weston, four hundred and eighty tons, had a draught of eighteen feet six inches on even keel. This is very strong practical and cotemporaneous evidence, of the depth being in this case near what was proper. Charles Pearsons, also, an inspector of ships, testified the Mattakeeset had been recorded in his books as a vessel of eighteen feet draught, with a common cargo. The agents of the shippers not agreeing in opinion with the captain and owners, that this depth was sufficient, and insisting on the right under the charter party to fill the vessel full of lighter articles, and which would have increased her draught four or five inches more, the captain also called a survey by three American captains.

This course had been recommended to him by the owners in case of any difficulty.

Two of the captains examined the vessel and the loading, and reported and placed their opinions on the consular files there, open to the inspection of the agents and others, stating that the load on board deepened as much as was safe, considering the state of the monsoons at that season, in May, and the dangers of navigation generally after at sea. as well as for eighty miles down the river against head winds. Their oaths since have been given to depositions, verifying this survey, as that of the captain of the Mattakeeset in support of his own views, concurring with theirs. and formed from his own experience in the vessel during the whole voyage out and back. He testifies. also, that he sent to the agents a copy of the survey the day it was made. The pilot at Calcutta, whose deposition was taken by the respondents, but not being used by them, was read on the part of the plaintiffs, sustained, in some respects, the captain, and swore this vessel went to sea so deep as is usual there. And the third captain named on the survey, but not then attending, it is testified by two witnesses. informed them that the vessel was loaded deep enough. It was an admitted fact, too, that she actually had on board nearly double the weight of her measured tonnage; about eight hundred and sixty-nine tons to a measurement of four hundred and eighty. Opposed to this, and in favor of the safety and propriety of loading the vessel deeper, are the depositions of several sea captains residing in this neighborhood, who have seen the vessel, some before, and some since,' her return.' A portion of them think she would have worked better if filled up. Some think the monsoons at that season did not increase much the danger. Some, judging from her height out of water, and some from her draught, that more loading would not have rendered her unsafe. The agents of the shippers in Calcutta testify to a like opinion, and that the captain of the Mattakeeset was not sufficiently communicative. and did not consult them as to any survey; and their evidence renders it probable he might have sent to them a copy of his protest, rather than of the survey. They further swore that the pilot had informed them vessels often went to sea drawing more than this one did. The third captain named on the survey, but not attending to it, testified that the Mattakeeset might. in his opinion, have safely taken in more loading. So thought and testified also the inspector here, who had sworn to her being rated on his books at eighteen feet draught.

Now, weighing this and the previous testimony, though quite in conflict, I feel constrained to come to the conclusion that the balance is in favor of the plaintiffs. whether the burthen of proof be considered on them or not. They have the weight of the builder himself of the vessel. who ought to know her design and capacity and dangers, the great weight of those who had actually sailed in and navigated her for years, the oath of the captain then in her, the oaths of two others called in as advisers and quasi umpires on this very subject at Calcutta, the opinion of the pilot himself, who took her to sea, and the corroborating views of several other experts. All these united must preponderate over the general views of some other experts, without any personal sailing in the vessel, or any examination of her at Calcutta, (except the third captain,) but only seeing her here before her voyage. or after she had been lightened, not only three inches by salt water, but eight inches by the consumption of her water and provisions on the voyage home. The actual fact of this vessel never having been so loaded in former voyages for a series of years as to draw more, that when suspecting more had or would be put in by the charterers. the caution was at once given to them against it, the precaution, under the difference of opinion, to have a survey on the spot, which resulted in favor of the plaintiffs, the fact that the agents of the respondents attempted no new survey, though the other. if not formally reaching them from the captain on the 20th of April, was on the public files of the consul fourteen days before the sailing of the vessel on the 4th of May, the striking circumstance that the three other American vessels then and there loading did not in fact take in cargoes to draw more, in proportion to their size, are, when united, very decisive, that this vessel carried as much as she was bound to do by her contract, when fairly construed. The survey is not referred to as a conclusive measure, or one entitled to official weight. or indeed any beyond that of statements made by experienced and intelligent men on matters with which they are familiar. under attention specially turned to them at the time, and afterwards supported by their testimony duly taken; but like other nautical usages. such as conferences with the crew as to steps to be pursued in sailing in a storm. or in throwing over goods for safety (Abb. Shipp.' 352, note), it often indicates prudence and commendable caution. It is no answer to this result. that other vessels from Calcutta sometimes go to sea drawing more, as the ships in the India trade are large, and from England are frequently over double the size of the Mattakeeset, drawing as much or more water than some heavy frigates. But there is no proof—on the contrary, it is disproved that other vessels of a like size usually load there to a greater depth. To avoid difficulty. the maximum depth to which a vessel may be loaded, when so chartered. had better always be inserted in the contract. and the proviso. likewise. that freight be paid pro rata, though a full cargo should not. by accident or other unblamable cause. be delivered.

Another source of controversies in these

cases, and especially in the present, is the want of full, friendly and frequent communication between captains and the agents. Such communications tend to prevent trouble from want of seasonable information, and foster a disposition on both sides to be accommodating, and not particular as to going a little beyond, or falling a little short, of what strict law may require. But it is proper to add here, that in this case no evidence or appearance exists of management, concealment or fraud on the part of the respondents or the captain, to avoid their contract or their duty. Their objections to loading with a deeper draught were made promptly, openly and sustained in a fair and manly form by the survey called. This is commendable, and entitles them to a liberal construction of their conduct. Again, a course marked by due caution and care against dangers and losses, as was the captain's in this case, deserves approbation, when not carried to an extent indicating timidity or mere selfishness in behalf of himself or owners. One of our national failings may be deemed rashness, or daring and risking too much, and its calamities are often a warning to others, not lightly to be disregarded, and at least not to be encouraged in cases of difficulty or doubt by courts of justice in not upholding the side of safety, of prudence and caution.

I think, therefore, that the full freight stipulated should be paid.